

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-1710-12

### CHRISTOPHER JAMES WADE, Appellant

### v.

### THE STATE OF TEXAS

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE TENTH COURT OF APPEALS
### MCLENNAN COUNTY

COCHRAN, J., delivered the opinion of the Court in which KELLER, P.J., and PRICE, WOMACK, JOHNSON, KEASLER, HERVEY, and ALCALA, J., joined. MEYERS, J., did not participate.

### O P I N I O N

The Supreme Court has consistently held that a person's refusal to cooperate with a police request during a consensual encounter cannot, by itself, provide the basis for a detention or *Terry* frisk.[1] Because appellant's refusal to cooperate was accompanied only

---

[1] *Florida v. Bostick*, 501 U.S. 429, 437 (1991) ("[A] refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure."); *Florida v. Royer*, 460 U.S. 491, 498 (1983) (plurality op.) (a suspect's refusal to listen or answer a police

by his extreme nervousness and a game warden's hunch he was up to no good, the warden's stop-and-frisk of appellant violated the Fourth Amendment. We therefore reverse the judgment of the court of appeals that had upheld the stop-and-frisk.[2]

I.

Appellant, Christopher James Wade, is an electrician who was spending his lunch hour sitting in his work truck in the near-empty parking lot of the Flat Rock public boat ramp off Lake Waco in China Spring, Texas. It was mid-May in Texas, so he had his truck engine running.

Jason Campbell and James Ranft–game wardens for the Texas Parks and Wildlife Department–pulled up their boat to the ramp right around lunchtime to investigate fishing violations. Warden Campbell got out and approached appellant's truck. He had noticed its engine was running and "wanted to make sure the occupant was okay."[3] He also thought that the truck was "out of place" and "suspicious" because he did not see a boat or any fishing equipment. Instead, the truck had a large box trailer attached with "Wade Electric" printed on the sides. Warden Campbell said that he would not classify the boat ramp area as a "high

---

officer's questions in a nonseizure circumstance "does not, without more, furnish" the officers with reasonable suspicion for a seizure.).

[2] *Wade v. State*, No. 10–10–00366–CR, 2012 WL 3055279, 2012 Tex. App. LEXIS 10903 (Tex. App.—Waco July 26, 2012) (not designated for publication).

[3] Warden Campbell testified that he generally investigates every car that is parked in the boat-ramp lot; it is his normal routine and habit to do so, and he is suspicious of any vehicle parked in the boat ramp that does not have a boat attached to it.

crime area," but he had made some narcotics arrests there and had issued numerous citations for fishing and boating violations.

Appellant rolled his window down, and Warden Campbell asked him if he was okay. Appellant said he was eating lunch, but the warden thought that was a lie because he did not see any "evidence"–food, wrappers, or a cooler–of a lunch. There was "nothing of the kind that would have supported that claim." When asked, appellant said that he lived "nearby," but his license, turned over on request, showed that he lived some fifteen miles away in Elm Mott, rather than China Spring, so the warden figured that was a lie, too.[4] Appellant explained that he was "looking at purchasing a house close to the boat ramp." Warden Campbell considered this a third lie. And appellant was overly nervous. Warden Campbell explained that he felt concerned for his safety.

> From the onset of the contact, I noticed that his–demeanor was–was one of nervousness. At the point when his story changed about the third time, I asked him if he had any weapons or anything that I should be aware of and he replied with, why are you doing this to me. And I thought that was quite a strange response for someone that was just eating their lunch or taking a break. And I asked a second time if he had any weapons or any contraband on his person that I should know about. And he asked again, why are you doing this. [After he refused to allow a search of his vehicle,] I asked him to step out of the vehicle and explained that I was going to conduct a pat-down for my safety.

As ordered, appellant got out of his truck. Warden Campbell "frisked" him and again asked if there was anything he should know about. Appellant said there was a pipe in the truck. The warden searched the truck and found the pipe and a small amount of methamphetamine.

---

[4] According to Google Maps, the drive between the Flat Rock boat ramp in China Spring and the town of Elm Mott takes a little under thirty minutes. *See* www.maps.google.com.

The State filed a felony drug charge, and appellant filed a motion to suppress.

After an evidentiary hearing, the trial judge denied appellant's motion. The trial judge held that the actions Warden Campbell observed created an objective and particularized basis for reasonable suspicion that appellant was engaged in criminal activity. Appellant pled guilty to possession of a controlled substance, was sentenced to one year's confinement in state jail, and appealed the trial judge's ruling on his motion to suppress. The court of appeals affirmed,[5] because Warden Campbell observed three "objective facts" that created a reasonable suspicion that appellant was engaged in criminal activity and posed a threat. First, "Officer Campbell became suspicious when Wade changed his story concerning his reason for being at the boat ramp."[6] Second, "Wade appeared very nervous."[7] And third, "Officer Campbell asked Wade two times if he had any weapons, and Wade did not answer the question, instead giving what Officer Campbell considered strange responses."[8]

Appellant's petition for review asks whether a reasonable-suspicion determination that criminal activity and potential danger may be derived–almost wholly–from a citizen's refusal to answer questions about what he has in his truck or to permit a search of his truck.[9]

---

[5] *Wade*, 2012 WL 3055279 at *3.

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] Appellant's three grounds of review, with some abbreviation, are

(1)    The Court of Appeals erred in holding that repeated questioning by a game warden coupled

II.

**A.    Standard of Review**

When reviewing the ruling on a suppression motion, we afford almost total deference to the trial judge's determination of historical facts—if supported by the record.[10] Regardless of whether the judge granted or denied the motion, appellate courts view the evidence in the light most favorable to the ruling.[11] The prevailing party is afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it.[12] We review *de novo* a trial judge's application of the law of search and seizure to the facts.[13] We will uphold the trial judge's ruling if it is reasonably grounded in the record and correct on any theory of law applicable to the case.[14]

---

with consecutive denials by the citizen do not escalate a 'consensual encounter' into a detention/seizure requiring reasonable suspicion.

(2)    The Court of Appeals finding that the repeated refusal of a citizen to answer the question: Do you have any weapons. . . ?, constitutes reasonable suspicion to order the citizen out of his car for a pat-down is an improper application of this court's holdings[.]

(3)    The Court of Appeals misapplied *Terry v. Ohio* and its Texas progeny . . . by failing to overturn the trial court's improper conclusions of law that a citizen's refusal to answer questions concerning being armed during a 'consensual encounter' provided a legitimate basis for a detention and pat-down.

[10] *State v. Woodard*, 341 S.W.3d 404, 410 (Tex. Crim. App. 2011) (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)).

[11] *Id.* (citing *State v. Garcia–Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008)); *Gutierrez v. State*, 221 S.W.3d 680, 687 (Tex. Crim. App. 2007).

[12] *Woodard*, 341 S.W.3d at 410.

[13] *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010); *Wiede v. State*, 214 S.W.3d 17, 25 (Tex. Crim. App. 2007).

[14] *Valtierra*, 310 S.W.3d at 447–48.

**B.      Police-Citizen Interactions**

There are three distinct types of police-citizen interactions: (1) consensual encounters that do not implicate the Fourth Amendment; (2) investigative detentions that are Fourth Amendment seizures of limited scope and duration that must be supported by a reasonable suspicion of criminal activity; and (3) arrests, the most intrusive of Fourth Amendment seizures, that are reasonable only if supported by probable cause.[15] Police officers are as free as any other citizen to approach citizens to ask for information or cooperation.[16] Such consensual encounters may be uncomfortable for a citizen, but they are not Fourth Amendment seizures.[17]

No bright-line rule governs when a consensual encounter becomes a detention.[18] Courts must take into account the totality of the circumstances of the interaction to decide whether a reasonable person would have felt free to ignore the police officer's request or

---

[15] *Woodard*, 341 S.W.3d at 410-11 (citing *Florida v. Bostick*, 501 U.S. 429, 434 (1991); *Terry v. Ohio*, 392 U.S. 1, 30–31 (1968); *Gerstein v. Pugh*, 420 U.S. 103, 111–12  (1975)).

[16] *Garcia-Cantu*, 253 S.W.3d at 243.

[17] *Id.*  As the Supreme Court noted in *Florida v. Royer*, 460 U.S. 491 (1983),

[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions.

*Id.* at 497-98 (plurality op.) (citations omitted).

[18] *Woodard*, 341 S.W.3d at 412 (citing *Brendlin v. California*, 551 U.S. 249, 255 (2007)).

terminate the consensual encounter.[19] This is the *Mendenhall* test.[20] If ignoring the request or terminating the encounter is an option, then no Fourth Amendment seizure has occurred.[21] But–as the Supreme Court made clear in *California v. Hodari D.*[22]–if an officer through force or a show of authority succeeds in restraining a citizen in his liberty, the encounter is no longer consensual; it is a Fourth Amendment detention or arrest, subject to Fourth Amendment scrutiny.[23] The question of whether the particular facts show that a consensual

---

[19] *State v. Castleberry*, 332 S.W.3d 460, 467 (Tex. Crim. App. 2011). As the case law has played out, the "reasonable person" is assumed to have considerable fortitude. *See* Daniel J. Steinbock, *The Wrong Line Between Freedom and Restraint: The Unreality, Obscurity, and Incivility of the Fourth Amendment Consensual Encounter Doctrine*, 38 SAN DIEGO L. REV. 507, 563 (2001) ("Who, then, is the American 'reasonable person' when it comes to police interactions? A review of the case law above provides some characteristics. He is someone who knows his rights and feels free to exercise them. He is not intimidated by the police, whether they are alone or in a group, in uniform or in plain clothes. He knows that when questioned, he can refuse to answer, and when asked for identification, he can decline to comply. He always feels free to end the encounter even if physically constrained by his surroundings and even if the police persist in their attempts to engage him in conversation. He rests secure in the knowledge that no physical harm will result and that the police cannot legally draw an inference of criminality from his refusal to cooperate. In short, he regards an encounter with police as no different from one with a panhandler on the street, a religious proselytizer at his doorstep, or a Hare Krishna in the airport. This is the American version of the man in the Clapham bus: the hypothetical reasonable person on the Greyhound bus.").

[20] *Florida v. Royer*, 460 U.S. 491 (1983) (relying on *Mendenhall* to conclude that the circumstances–"a show of official authority such that a reasonable person would have believed that he was not free to leave"–indicated a Fourth Amendment seizure); *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) ("a person has been seized within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave."); *Morris v. State,* 739 S.W.2d 63, 66 (Tex. Crim. App. 1987) ("*Mendenhall* and *Royer* indicate the circumstances of a case must be examined in order to decide if a defendant would have reasonably believed that he was not free to leave.").

[21] *Castleberry*, 332 S.W.3d 460, 467 (Tex. Crim. App. 2011).

[22] 499 U.S. 621, 627-28 (1991).

[23] *Castleberry*, 332 S.W.3d at 467; *Hodari D.*, 499 U.S. at 627-28.

encounter has evolved into a detention is a legal issue that is reviewed *de novo*.[24]

## C.    Reasonable Suspicion

Reasonable suspicion of criminal activity permits a temporary seizure for questioning that is limited to the reason for the seizure.[25] A police officer has reasonable suspicion for a detention if he has specific, articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably conclude that the person detained is, has been, or soon will be engaged in criminal activity.[26]  This is an objective standard that disregards the actual subjective intent of the arresting officer and looks, instead, to whether there was an objectively justifiable basis for the detention.[27]

The standard also looks to the totality of the circumstances;[28] individual circumstances may seem innocent enough in isolation, but if they combine to reasonably suggest the imminence of criminal conduct, an investigative detention is justified.[29] "It is enough to satisfy the lesser standard of reasonable suspicion that the information is sufficiently detailed and reliable—*i.e.*, it supports more than an inarticulate hunch or intuition—to suggest that

---

[24] *Garcia-Cantu*, 253 S.W.3d at 241.

[25] *United States v. Brignoni-Ponce*, 422 U.S. 873, 881-82 (1975).

[26] *Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011) (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *Terry*, 392 U.S. at 21-22)).

[27] *Id*.

[28] *Id.* (citing *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)).

[29] *Id.* (citing *Reid v. Georgia,* 448 U.S. 438, 441 (1980); *Sokolow*, 490 U.S. at, 9-10; *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)).

something of an apparently criminal nature is brewing."[30] A person's refusal to cooperate with a police request during a consensual encounter cannot, by itself, provide the basis for a detention.[31]

As with the question of whether a consensual encounter has become a Fourth Amendment detention, the question of whether a certain set of historical facts gives rise to reasonable suspicion is reviewed *de novo*.[32]

**D.    *Terry* Frisk**

If an officer is justified in believing that a person whose suspicious behavior he is investigating is armed, he may frisk that person to determine if the suspect is, in fact, carrying a weapon and, if so, to neutralize the threat of physical harm.[33] The purpose of a *Terry* frisk is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence.[34] But police may not escalate a consensual encounter

---

[30] *Derichsweiler*, 348 S.W.3d at 917.

[31] *Florida v. Bostick*, 501 U.S. 429, 437 (1991); *Florida v. Royer*, 460 U.S. 491, 498 (1983) (plurality op.).

[32] *See Davis v. State*, 947 S.W.2d 240, 249 (Tex. Crim. App. 1997) (Keller, J., concurring); *see also Madden v. State*, 242 S.W.3d 504, 517 (Tex. Crim. App. 2007) (whether the totality of the circumstances is sufficient to support an officer's reasonable suspicion is a legal question that is reviewed *de novo*).

[33] *Terry*, 392 U.S. at 24.

[34] *Carmouche v. State*, 10 S.W.3d 323, 329 (Tex. Crim. App. 2000); *see Terry*, 392 U.S. at 29 ("The sole justification of the search in the present situation is the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer.").

into a protective frisk without reasonable suspicion that the person (1) has committed, is committing, or is about to commit a criminal offense *and* (2) is armed and dangerous.[35]

With that general background, we turn to the facts of this case.

III.

Appellant argues that Warden Campbell did not have reasonable suspicion to order him out of his truck and frisk him because his refusal to answer certain questions was not a legitimate basis for a detention or pat-down. We conclude that the courts below misapplied *Terry* in allowing appellant's action of standing on his rights to serve as the tipping point in the reasonable-suspicion calculus.

**A.    The consensual encounter escalated into a detention when Warden Campbell ordered appellant out of the truck for a pat-down.**

Warden Campbell testified that their interaction began as a consensual encounter, but that "when he said he was eating lunch and I looked in there and there was no evidence of that and then he gave me the story about living there and I looked at his I.D., that's when he was detained." Appellant asserts that he was detained after the warden asked him, for a second time, what was in his truck instead of answering appellant's own question of "Why are you doing this to me?" The State's position is the Fourth Amendment detention did not occur until appellant was ordered out of his truck and subjected to the *Terry* frisk.

The detention test is objective, so neither the warden's uncommunicated state of mind nor appellant's subjective belief controls. When Warden Campbell simply repeated his

---

[35] *Adams v. Williams*, 407 U.S. 143, 146 (1972); *Carmouche*, 10 S.W.3d at 329.

question about weapons or contraband after appellant asked him why he was asking such a question, appellant again refused to answer; instead, he again asked, "Why are you doing this to me?" Appellant then refused to consent to a search of his truck. Under *Hodari D*., a Fourth Amendment seizure requires submission to the show of authority.[36] And appellant had not yet submitted to Warden Campbell's assertion of authority.[37] We agree with the State that appellant was not "seized" until he complied with Warden Campbell's order to get out of his truck for a frisk. At that moment appellant was detained under the Fourth Amendment.

**B.     At the time of the *Terry* frisk Warden Campbell did not have (1) reasonable suspicion that something of a criminal nature was afoot, or (2) an objectively reasonable concern for his safety.**

On the facts of this case, there is precious little to sustain the legal conclusion that Warden Campbell had reasonable, particularized suspicion of appellant such that a Fourth Amendment detention and nonconsensual frisk were lawful. The lower courts relied on three facts: (1) appellant's "unordinary nervousness," (2) his "changing story" about why he was

---

[36] *California v. Hodari D.*, 499 U.S. 621, 627-28 (1991).

[37] *State v. Castleberry*, 332 S.W.3d 460, 469 (Tex. Crim. App. 2011) ( no seizure when suspect refused to yield to officer's show of authority; "Here, despite Officer Barrett's repeated demands to Castleberry to put his hands above his head, Castleberry ignored the orders and tossed the baggie of cocaine on the ground. Officer Barrett then arrested Castleberry. Under the Fourth Amendment, Castleberry was not seized until he was arrested.") (citing *Hodari D.*); *see* Daniel J. Steinbock, *The Wrong Line Between Freedom and Restraint: The Unreality, Obscurity, and Incivility of the Fourth Amendment Consensual Encounter Doctrine*, 38 SAN DIEGO L. REV. 507, 516 (2001) ("In *California v. Hodari D.*, the Court assumed that if an officer's action amounted to a show of authority sufficient to convey the message that the person was not free to leave . . . , a seizure could result. It held, however, that a seizure did not occur until either the individual actually submitted to the show of authority or the officer applied physical force.").

at the boat ramp, and (3) his "strange [Why are you doing this to me?] responses" to the warden's questions about weapons and contraband.

The record does not, however, support Warden Campbell's conclusion that appellant "changed his story" about why he was at the boat ramp, and appellant's "strange responses" were simply a citizen's attempt to put an end to a consensual encounter. Nervousness and a refusal to answer an officer's questions are insufficient by themselves to constitute reasonable suspicion, and, in this case, they do not combine to provide the basis for the detention and weapons frisk.

The facts that an officer relies on to raise suspicion that illegal conduct is afoot need not be criminal in themselves; "they may include any facts which in some measure render the likelihood of criminal conduct greater than it would otherwise be."[38] But the totality of the suspicious circumstances that an officer relies on "must be sufficiently distinguishable from that of innocent people under the same circumstances as to clearly, if not conclusively, set the suspect apart from them."[39] None of the circumstances preceding Warden Campbell's order to get out of the truck, even when viewed in the light most favorable to the trial judge's ruling, justified a reasonable suspicion that appellant was involved in criminal conduct.[40]

1.    **"Unordinary Nervousness"**

---

[38] *Crockett v. State*, 803 S.W.2d 308, 311 (Tex. Crim. App. 1991).

[39] *Id.* (citing *Brown v. Texas*, 443 U.S. 47, 52 (1979)).

[40] *Brown*, 443 U.S. at 51-52.

Warden Campbell testified that, when he asked appellant questions, his "voice was wavering" and "his vein in his neck [was] beating." As the warden continued to ask questions, appellant was "acting quite nervous," and that made Warden Campbell concerned for his safety. Nervousness is not sufficient to establish reasonable suspicion, but nervous or evasive behavior is a relevant factor in determining reasonable suspicion for a *Terry* stop and frisk.[41] However, it is not particularly probative because "most citizens with nothing to hide will nonetheless manifest an understandable nervousness in the presence of the officer."[42] And the more accusatory the questions that an officer asks, the more nervous a citizen legitimately becomes.[43]

## 2.    "Changing Story"

---

[41] *Hamal v. State*, 390 S.W.3d 302, 308 (Tex. Crim. App. 2012); *Balentine v. State*, 71 S.W.3d 763, 769 (Tex. Crim. App. 2002).

[42] *Glass v. State*, 681 S.W.2d 599, 602 (Tex. Crim. App. 1984); *see also Sieffeert v. State*, 290 S.W.3d 478, 481 (Tex. App.–Amarillo 2009, no pet.) (after stopping motorist because her SUV was driving slowly in a high-crime area, officer continued his questioning even after he failed to find any reason for suspicion because occupants "seemed nervous"; driver's refusal to consent could not justify search unless other reasonable suspicion existed and nervousness was of minimal probative value); *United States v. Salzano*, 158 F.3d 1107, 1113 (10th Cir. 1998) (discounting officer's reliance on detainee's nervousness because "it is common for most people to exhibit signs of nervousness when confronted by a law enforcement officer whether or not the person is currently engaged in criminal activity."); *State v. Lee*, 658 N.W.2d 669, 678-79 (Neb. 2003) ("[N]ervousness is of limited value" in reasonable-suspicion calculus as "it is common knowledge that most citizens whether innocent or guilty, when confronted by a law enforcement officer who asks them potentially incriminating questions are likely to exhibit some signs of nervousness.").

[43] *See Damato v. State*, 64 P.3d 700, 709 (Wyo. 2003) (when motorist refused officer consent to search car, and officer then asked "whether there was some reason he did not want the officer looking in the car," motorist's extreme nervousness, including "sweating heavily although it was a chilly day, his carotid artery pulsating hard and fast, and an inability to keep eye contact" was discounted because "[r]ealistically, few citizens would not have become uncomfortable to some degree with these questions").

Appellant told the warden three things: he was having his lunch, he lived nearby, and he was interested in buying property nearby. All lies, according to the warden:

- "his story changed about the third time";
- "he changed his story three times";
- "why is this man lying to me";
- "everyone is nervous when approached by the police. But to the point when you're lying";
- "when I began asking him about what he was doing there, the lies that he told[.]"

Giving due respect to the instinct of the experienced game warden, we cannot see how appellant's explanations could transform the objectively innocent activity of sitting in a work truck at a public boat ramp during the lunch hour into conduct giving rise to a reasonable suspicion of criminal activity. The "I am eating lunch, I live nearby, and I am interested in buying property nearby" statements are not even "admittedly odd,"[44] much less suggestive of a pretext for criminal activity. "The behavior upon which" Warden Campbell "relied may have seemed odd to [him]. But that is not the issue."[45] What matters are the objective facts that indicate criminal activity, not the officer's characterization of them.[46]

Warden Campbell agreed that he had no more than a hunch that appellant was lying. On cross-examination he admitted that he had no personal knowledge of whether appellant was telling the truth about whether he had eaten lunch or where he lived. He testified, "I

---

[44] *See Derichsweiler v. State,* 348 S.W.3d. 906, 909 (Tex. Crim. App. 2011).

[45] *Crockett*, 803 S.W.2d at 313.

[46] *Davis v. State*, 947 S.W.2d 240, 242 (Tex. Crim. App. 1997) ("[W]hen viewed in an objective fashion, no known fact . . . would support the conclusion that [the defendant] was engaged in or soon would engage in criminal activity.").

believed that he was lying."  But

> an officer and the Government must do more than simply label a behavior as "suspicious" to make it so. The Government must also be able to either articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the behavior is likely to be indicative of some more sinister activity than may appear at first glance.[47]

Because the warden's characterization of appellant's replies as lies is not supported by the record, we disregard the finding that the "changing story" had probative value in the reasonable suspicion analysis.

### 3.      "Strange Responses"

The trial judge did not set out the "strange responses" to the warden's questions in his findings.  However, the record makes clear that this is a reference to appellant's "Why are you doing this to me?" questions and his refusal to consent to a search of his truck. The dialogue, as related by the warden's testimony and offense report, went like this:

Warden:      Do you have any weapons or anything that I should be aware of?
Appellant:   Why are you doing this to me?
Warden:      Do you have any weapons or any contraband on your person that I should know about?
Appellant:   Why are you doing this to me?
Warden:      Can I search your vehicle?
Appellant:   No.
Warden:      Step out of your vehicle.  I am going to pat you down for my safety.

---

[47] *United States v. Foster*, 634 F.3d 243, 248-49 (4th Cir. 2011) ("we are deeply troubled by the way in which the Government attempts to spin these largely mundane acts into a web of deception.  Although these matters generally only come before this Court where a police seizure uncovers some wrongdoing, we would be remiss if we did not acknowledge that the exclusionary rule is our sole means of ensuring that police refrain from engaging in the unwarranted harassment or unlawful seizure of anyone").

Such evidence may not serve as the tipping point in a reasonable-suspicion calculus. As the Supreme Court held in *Brown v. Texas*,[48] a refusal to engage in a consensual encounter is not grounds for a detention and pat-down. In that case, two officers saw Brown and another man walk away from each other in an alley once the men noticed the officers' patrol car. [49] The officers did not suspect Brown of any specific misconduct, nor did they have any reason to believe that he was armed. Nonetheless, they asked Brown to identify himself and explain what he was doing there. Brown "refused to identify himself and angrily asserted that the officers had no right to stop him."[50] When he continued to protest, Brown was first frisked and then arrested for refusing to give his name and address to an officer "who has lawfully stopped him and requested the information."[51] The Supreme Court held that, because the officers had no reason to suspect Brown of wrongdoing, they had no basis for detaining him.[52] In other words, Brown's angry refusal to engage in a "consensual encounter" did not create a reasonable suspicion of wrongdoing.[53]

---

[48] 443 U.S. 47 (1979).

[49] *Id.* at 48-49.

[50] *Id.* at 49.

[51] *United States v. Mendenhall*, 446 U.S. 544, 556 (1980) (examining *Brown*).

[52] *Brown*, 443 U.S. at 52-53.

[53] In *I.N.S. v. Delgado*, 466 U.S. 210 (1984), the Supreme Court reiterated the applicable rule:

What is apparent from *Royer* and *Brown* is that police questioning, by itself, is unlikely to result in a Fourth Amendment violation. While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response. Unless

While the Supreme Court has held that a refusal to cooperate with a consensual encounter (or consensual search) is not sufficient by itself to constitute reasonable suspicion, that Court has not held that such a refusal is irrelevant to the *Terry*-stop calculus. Some courts have found that a "change in course" during a consensual encounter–an abrupt refusal to answer questions, a consent to search some items but not others, or a revocation of a previously granted consent–may support a finding of reasonable suspicion.[54] Other courts, however, have held that such a refusal may not be part of the basis for a *Terry* stop-and-frisk.[55] And still others have trod a middle ground.

> the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment. But if the person refuses to answer and the police take additional steps—such as those taken in *Brown*—to obtain an answer, then the Fourth Amendment imposes some minimal level of objective justification to validate the detention or seizure.

*Id.* at 216-17; *see also United States v. Mayo*, 361 F.3d 802, 806 (4th Cir. 2004) ("A suspect's refusal to cooperate with police, without more, does not satisfy *Terry* stop requirements.").

[54] *United States v. Carter*, 985 F.2d 1095, 1097 (D.C. Cir. 1993) (reasonable suspicion may be based on the manner in which the suspect withdraws his consent to search belongings during a consensual encounter; defendant withdrew his consent to have officer search his bag by "snatching" the bag back and purportedly searching it himself, then rolling it up, and showing officer his empty palms); *United States v. Jones*, 973 F.2d 928, 931 (D.C. Cir. 1992) ("A suspect is 'free to leave' a nonseizure interview, but when he does so by abruptly bolting after having consented to talk, the officers are free to draw the natural conclusions.").

[55] *United States v. Hunnicutt*, 135 F.3d 1345, 1350-1351 (10th Cir. 1998) ("Officer Raines explicitly testified that the refusal to consent persuaded him Mr. Hunnicutt 'had something to hide.' Although ample other factors supporting reasonable suspicion were present here, as well as alternative justifications for all searching and further detention, we emphasize that refusal to consent should not have been considered in determining reasonable suspicion. Any other rule would make a mockery of the reasonable suspicion and probable cause requirements, as well as the consent doctrine. These legal principles would be considerably less effective if citizens' insistence that

For example, in *United States v. Wilson*, the Fourth Circuit was faced with "the question of the effect of a person's unsuccessful attempt to terminate what began as a consensual encounter."[56]  Wilson, a deplaning passenger, at first acquiesced to DEA questioning and a search of his bags and person, but eventually balked when the officers wanted to search his coats as well.  The officers continued to question him against his will.[57]  "Despite his best efforts, Wilson was unable to 'terminate the encounter,' 'to ignore the police presence and go about his business,' or to 'go on his way.'"[58]  The Fourth Circuit held that Wilson's refusal to consent to a further search and his lack of continued cooperation was

searches and seizures be conducted in conformity with constitutional norms could create the suspicion or cause that renders their consent unnecessary."); *United States v. Torres*, 65 F.3d 1241, 1247 (4th Cir. 1995) ("When it is recalled that no prior suspicion attached to Torres before the blind encounter initiated by the officers at the train station, and when her action in standing on her rights is factored out of the assessment, what remains does not suffice to support the district court's finding that the original detention of her luggage was based upon a reasonable suspicion of criminal conduct."); *United States v. White*, 890 F.2d 1413, 1417 n.4 (8th Cir. 1989) ("Officers Coulson and Fox cannot use White's refusal to consent to the search of his bags as support for the requisite reasonable, articulable suspicion."). *See* Kenneth J. Melilli, *The Consequences of Refusing Consent to a Search or Seizure: The Unfortunate Constitutionalization of an Evidentiary Issue*, 75 S. CAL. L. REV. 901, 914 (2002) ("We are told that the inclusion of 'refusal to consent' evidence in determining the presence of probable cause or reasonable suspicion would mean that 'there would be no circumstances under which officers could not search,' that 'police could command citizens to stop with impunity and without any basis for any suspicion whatsoever, and then could make a lawful stop as soon as the citizen declined to heed the original unlawful command,' that 'a police officer would be entitled to frisk a citizen regardless whether he refuses or consents to a search request,' and that 'police officers could manufacture reasonable suspicion in virtually every case.'"); *see generally*, Comment, Rachel Karen Laser, *Unreasonable Suspicion: Relying on Refusals to Support Terry Stops,* 62 U. CHI. L. REV. 1161 (1995).

[56] 953 F.2d 116, 121 (4th Cir. 1991).

[57] *Id.* at 118-20.

[58] *Id.* at 122.

not a factor to be considered in the reasonable-suspicion calculus.[59] The court did not, however, draw a bright-line rule; instead, it disapproved of the search because of the prominence of this factor in the reasonable-suspicion calculus. There was little else to support the detention and search: he purportedly lied about coming from Boston rather than New York, he glanced around the terminal a few times, and he had consented to a search of his luggage and person before getting angry and refusing to cooperate any more. These facts alone did not suffice to justify the seizure.[60]

We agree with the Fourth Circuit and decline to hold that a citizen's questions or refusal to cooperate with a police request during a consensual encounter can never be a factor in determining whether an investigative stop was justified,[61] but it cannot be the prominent

---

[59] *Id.* at 125-26. The court explained,

> We are left with the unavoidable impression that the real reason for the persistent questioning, *i.e.*, the seizure, was Wilson's refusal to allow a search of his coat. The government, however, avoids the obvious pitfall of positing the denial itself as a basis for suspicion and instead points to the particular wording of the reply. As recounted by Officer Crooke: "I asked him if I may search his coats. And in an angry tone he replied back to me, no, you had your chance, and I wasn't permitted to search them." After some time, Wilson stated that "there were some things in there he didn't want us to see . . .[,] some private things he didn't want us to see. . . ." The government does not suggest what form of denial would not have contributed to the officer's suspicion. The ominous implication in this argument is that only guilty persons have anything to keep from the eyes of the police. We are wary of allowing the exercise of the unequivocal right to ignore the police to be grafted onto the "reasonable suspicion" analysis.

*Id.* (citation omitted).

[60] *Id.* at 126.

[61] For example, a defendant's unprovoked flight from officers in an area of heavy narcotics trafficking supported reasonable suspicion that the defendant was involved in criminal activity and

factor as it was here.  When appellant withdrew his consent to the encounter by demanding to know why he was being targeted and then refusing to consent to any search, Warden Campbell needed some objective, factual justification–outside of appellant's withdrawal of consent–to support the detention.   Here, there was only appellant's understandable nervousness and the warden's hunch.  These facts, even viewed in the light most favorable to the trial judge's ruling,  did not amount to the "minimal level of objective justification" necessary to subject appellant to a forcible stop or a frisk.[62]

Because Warden Campbell lacked the quantum of suspicion required by *Terry* to make a forcible stop, he was not entitled to frisk appellant without a reasonable belief that appellant had a weapon and was about to use it.[63]  This standard was recently applied in *State v. Castleberry*.[64]  There, the officer–at the outset of a consensual encounter–did not see

---

justified a stop in *Illinois v. Wardlow*, 528 U.S. 119 (2000).  Wardlow had "fled upon seeing a caravan of police vehicles converge on an area of Chicago known for heavy narcotics trafficking." *Id.* at 121.  The Supreme Court reversed the state court's determination that sudden flight in a high crime area does not create a reasonable suspicion justifying a *Terry* stop because flight may simply be an exercise of the right to "go on one's way."  *Id.* at 122-23.

[62] *I.N.S. v. Delgado*, 466 U.S. 210, 216-17 (1984).

[63] 5 WAYNE LAFAVE, SEARCH AND SEIZURE § 9.6(a) at 841-43 (5th ed. 2012) ("if an officer, lacking the quantum of suspicion required by *Terry* to make a forcible stop, instead conducts a non-seizure field interrogation, he may not frisk the person interrogated upon suspicion he is armed; in such a case the officer may protect himself by not engaging in the confrontation.  But there is a limited exception to the latter principle.  If the officer has commenced a nonseizure confrontation without a pre-existing reasonable suspicion supporting a frisk, but such suspicion suddenly appears (most likely because of the suspect's conduct), then the officer is entitled to frisk for his own protection.").

[64] 332 S.W.3d 460 (Tex. Crim. App. 2011).

Castleberry as a threat, or observe any weapons. But the officer had found Castleberry behind a closed business in a high crime area.[65] And when asked for his identification, Castleberry reached for his waistband (as opposed to his pocket where a wallet would normally be kept), an act that could be reasonably construed as reaching for a weapon.[66] There was no pre-existing reasonable suspicion, but that suspicion arose based on Castleberry's conduct.

There was no such conduct in this case.[67] Warden Campbell's safety concern was based on the three facts discussed above, with the triggering fact being appellant's refusal to answer his questions about weapons or contraband.

> I was concerned for my safety at the time. When I asked him if he had any weapons or anything that I should know about, when he gave the reply of, why are you doing this to me, I–like I said, I thought that was quite a strange

---

[65] *Id*. at 469.

[66] *Id*.

[67] Professor LaFave lists circumstances that would justify a pat-down search:

a characteristic bulge in the suspect's clothing; observation of an object in the pocket which might be a weapon; an otherwise inexplicable sudden movement toward a pocket or other place where a weapon could be concealed; an otherwise inexplicable failure to remove a hand from a pocket; awkward movements manifesting an apparent effort to conceal something under his jacket; backing away by the suspect under circumstances suggesting he was moving back to give himself time and space to draw a weapon; awareness that the suspect had previously been engaged in serious criminal conduct; awareness that the suspect had previously been armed; awareness of recent erratic and aggressive conduct by the suspect; discovery of a weapon in the suspect's possession; discovery that the suspect is wearing a bullet[-]proof vest as to which he makes evasive denials; and awareness of circumstances which might prompt the suspect to take defensive action because of a misunderstanding of the officer's authority or purpose.

LAFAVE, *supra* note 63, § 9.6(a) at 857-62. This is not an exclusive list, but Texas cases are consistent with the federal standard set out by Professor LaFave.

response and indicative of someone that may have had something that they could hurt me or hurt himself.

Warden Campbell may have thought this was a strange response. But it looks to us as it did to appellant: "The citizen is simply demanding to know what is going on!"[68] In another case, a citizen's failure to respond to a direct question about the presence of weapons may be telltale, but in cases involving Fourth Amendment rights, the ultimate test is whether the officer had reasonable suspicion, under the totality of the circumstances, to conclude that appellant was engaged in something of a criminal nature and that he was armed and dangerous. Under our *de novo* review, these circumstances did not give rise to reasonable suspicion.

## C.    Conclusion

Neither nervousness nor a refusal to cooperate with an officer during a consensual encounter are sufficient by themselves to constitute reasonable suspicion. Nor were they

---

[68] Appellant's Response to the State's Brief at 6; *see Commonwealth v. Martin*, 927 N.E.2d 432, 438 (Mass. 2010) (officer did not have reasonable suspicion to detain defendant or frisk him simply because defendant appeared nervous, apparently lied about his age or name, and refused to respond to officer's inquiry concerning weapons; "Because it was within the defendant's right to ignore questions posed by the officers, his refusal to answer [officer's] question concerning whether he had a weapon cannot provide reasonable suspicion for his seizure."); *United States v. Massenburg*, 654 F.3d 480, 491 (4th Cir. 2011). As the Fourth Circuit explained in *Massenburg*,

> If the ordinary response of the innocent upon being asked to consent to a search–some mild nervousness–sufficed to create reasonable suspicion, then *Terry*'s reasonable suspicion requirement would become meaningless: officers could ask a citizen for permission to conduct a voluntary search, and, if denied, they could use the citizen's denial as evidence of criminal activity and perform the search anyway.

*Id.* at 491.

sufficient in combination with appellant's statements about his reasons for coming to the boat launch to provide the basis for the detention and  frisk. Appellant's statement about the pipe in his truck was derived from the warden's illegal detention and was "fruit of the poisonous tree," and therefore that statement could not provide probable cause for searching appellant's truck.  The trial judge erred in denying the motion to suppress, and the court of appeals erred in upholding that denial.  We therefore reverse the judgment of the court of appeals and remand the cause to the trial court for further proceedings consistent with this opinion.

Delivered: September 11, 2013
Publish