**AFFIRM; and Opinion Filed June 18, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-13-00326-CR

**LARRY BERRING, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 2**
**Dallas County, Texas**
**Trial Court Cause No. F-1255634-I**

## OPINION

Before Justices FitzGerald, Fillmore, and Evans
Opinion by Justice Fillmore

A jury convicted Larry Berring of possession, with intent to deliver, of four grams or more, but less than 200 grams, of cocaine. The trial court found two enhancement paragraphs alleged in the indictment to be true and assessed punishment of thirty years' imprisonment. In three issues, Berring asserts the trial court erred by denying his motion to suppress, excluding from evidence medical records that were relevant to his defense, and failing to afford him the right of allocution. We affirm the trial court's judgment.

## Background

Senior Corporal Jeffrey Grandy, who was a member of the Dallas Police Department's Southeast Division Crime Response Team (CRT) in May of 2012, testified the Grand Shopping Center is in a high crime area and is known for "open air drug sales." Further, in 2012, the area surrounding the shopping center had experienced a spike in robberies and burglaries. On May

11, 2012, Grandy drove by the shopping center and noticed a number of people "hanging out and loitering" in the parking lot.

At approximately 10:00 p.m., the CRT, which consisted of eight officers, went to the shopping center to investigate possible criminal trespass violations. The CRT approached the shopping center from more than one direction in multiple marked police cars. When Grandy and his partner arrived at the shopping center, he saw a small crowd of people in the parking lot in front of the Grand Liquor Store, one of the stores in the shopping center.[1] The Grand Liquor Store was closed when the CRT arrived at the shopping center. Grandy, however, agreed the Grand City Grocery, another store in the shopping center, was open.

According to Grandy, a representative of the Grand Liquor Store had completed a criminal trespass affidavit (CTA) and provided the CTA to the police department. The CTA admitted into evidence stated the Dallas Police Department was authorized, in the absence of the owner or manager of the property, "to enforce the criminal trespass statute, Section 30.05 of the Texas Penal Code." A police officer was authorized by the CTA to notify a person who was not authorized to be on the property "that his entry is forbidden and to leave the property immediately or face possible arrest pursuant to the criminal trespass statute." Grandy testified there was not a "no trespassing" signed posted at the liquor store, but a sign posted over the door of the liquor store stated, "No drinking. No loitering. No standing on premises" and warned that police were watching.

According to Grandy, a CTA allows a police officer to act for the business owner if an individual is not a customer of the business and is "loitering or hanging out" on the premises. When a location has a CTA on file with the police department, the CRT will briefly detain people at the location to identify each person. A member of the CRT will then check a database

---

[1] Other members of the CRT were investigating groups of people in other areas of the shopping center.

to see if a person has previously been given a criminal trespass warning for the location. If a person has been previously warned, that person will be arrested for criminal trespass. If a person has not previously received a criminal trespass warning for the location, the police officer will give the person a criminal trespass warning, but not make an arrest, and add the person to the database for that location. Grandy did not recall who was listed in the database as having already been warned based on the CTA for the Grand Liquor Store, but did not believe that Berring had previously received a criminal trespass warning for the location.

Grandy testified that, as he approached the crowd in the parking lot in front of the liquor store to "investigate possible criminal trespassing," people began "scattering a little bit." Berring, who was in the crowd, started walking around the east side of the shopping center. As Berring walked away, he continually looked over his shoulder at Grandy. Grandy gave a "loud verbal command" for Berring to stop. Instead of stopping, Berring began running away from Grandy. Berring choosing to run raised Grandy's suspicion because "innocent people usually don't run from the police."

Berring slipped in a mud puddle in the parking lot of the Manhattan Club, a nightclub located behind the shopping center. While Berring was on the ground, Officer Jesse Rodriguez got on Berring's back. Grandy, Rodriguez, and Officer David Roach testified that Berring resisted arrest and it ultimately required four officers to restrain him. Grandy testified that, during the altercation, Berring removed a bag from his pocket. The bag contained eighty-two individually wrapped "rocks" of crack cocaine.

Berring was charged with possession, with intent to deliver, of four grams or more, but less than 200 grams, of cocaine. Berring filed a motion to suppress "all evidence obtained in this case as a result of an illegal stop and arrest." The trial court denied the motion to suppress.

The jury found Berring guilty of possession, with intent to deliver, of four grams or more, but less than 200 grams, of cocaine. Berring submitted the issue of punishment to the trial court. The trial court found two enhancement paragraphs alleged in the indictment to be true and assessed punishment of thirty years' imprisonment.

## Motion to Suppress

In his first issue, Berring argues the trial court erred by denying his motion to suppress because Grandy did not have reasonable suspicion to detain him and, therefore, the ensuing arrest was illegal.

### *Standard of Review*

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013). We review the trial court's factual findings for an abuse of discretion, but review the trial court's application of the law to the facts de novo. *Id.* We give almost total deference to the trial court's determination of historical facts, particularly when the trial court's fact findings are based on an evaluation of credibility and demeanor. *Id.*; *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). We give the same deference to the trial court's conclusions with respect to mixed questions of law and fact that turn on credibility or demeanor. *State v. Ortiz*, 382 S.W.3d 367, 372 (Tex. Crim. App. 2012) (citing *Guzman v. State*, 955 S.W.2d 85, 87–89 (Tex. Crim. App. 1997)). We review mixed questions of law and fact that do not turn on credibility and demeanor as well as purely legal questions de novo. *State v. Woodward*, 341 S.W.3d 404, 410 (Tex. Crim. App. 2011); *Guzman*, 955 S.W.2d at 89.

In conducting our review, we generally consider only evidence adduced at the suppression hearing. *Turrubiate*, 399 S.W.3d at 150–51; *Gutierrez v. State*, 221 S.W.3d 680, 687 (Tex. Crim. App. 2007). However, when, as in this case, the parties relitigate the

–4–

suppression issue during the trial on the merits, we consider all evidence, from both the pretrial hearing and the trial, in our review of the trial court's ruling. *Turrubiate*, 399 S.W.3d at 151; *Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996). We view the evidence in the light most favorable to the trial court's ruling and afford the prevailing party the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. *Wade v. State*, 422 S.W.3d 661, 666–67 (Tex. Crim. App. 2013). We will uphold the trial court's ruling if it is reasonably supported by the record and is correct on any theory of law applicable to the case. *Id.* at 667. When, as in this case, the trial court does not make explicit findings of fact, we infer the necessary factual findings that support the trial court's ruling if the record evidence (viewed in the light most favorable to the ruling) supports these implied findings. *State v. Garica-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008).

### *Applicable Law*

The Fourth Amendment of the United States Constitution protects citizens from unreasonable searches and seizures by government officials. U.S. CONST. amend. IV. An investigative detention is a Fourth Amendment seizure and implicates Fourth Amendment protections. *Johnson v. State*, 414 S.W.3d 184, 191 (Tex. Crim. App. 2013); *Woodard*, 341 S.W.3d at 411.

To detain an individual for investigative purposes, the officer, based on his experience, must have a reasonable suspicion based on specific, articulable facts that, when combined with rational inferences from those facts, would lead him to conclude that an individual is, has been, or soon will be engaged in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968); *Wade*, 422 S.W.3d at 668. The officer must be able to articulate something more than an "inchoate and unparticularized suspicion or 'hunch.'" *Foster v. State*, 326 S.W.3d 609, 613 (Tex. Crim. App. 2010) (quoting *Terry*, 392 U.S. at 22). Rather, "the articulable facts must show 'that some

activity out of the ordinary has occurred, some suggestion to connect the detainee to the unusual activity, and *some indication that the unusual activity is related to crime.*'" *Derichsweiler v. State*, 348 S.W.3d 906, 916 (Tex. Crim. App. 2011) (quoting *Meeks v. State*, 653 S.W.2d 6, 12 (Tex. Crim. App. 1983)).

Reasonable suspicion is determined by considering whether the officer had "some minimal level of objective justification for making the stop." *Foster*, 326 S.W.3d at 613. In making a reasonable suspicion determination, we disregard the subjective intent of the officer making the stop and consider solely, under the totality of the circumstances, whether there was an objective basis for the stop. *Wade*, 422 S.W.3d at 668. Although some circumstances may seem innocent in isolation, they will support an investigatory detention if their combination leads to a reasonable conclusion that criminal activity is afoot. *Id.*; *Derichsweiler*, 348 S.W.3d at 914.

In determining what constitutes reasonable suspicion, we look only at those facts known to the officer and cooperating officers at the inception of the detention. *State v. Duran*, 396 S.W.3d 563, 568-69 (Tex. Crim. App. 2013); *State v. Castleberry*, 332 S.W.3d 460, 467 (Tex. Crim. App. 2011) ("Whether the State has met its burden must be determined by considering the specific facts known to the officer at the moment of detention."); *see also Derichsweiler*, 348 S.W.3d at 914 (objective standard includes facts known to cooperating officers for purposes of making determination of reasonable suspicion; detaining officer need not be personally aware of all facts known to cooperating officers). If the facts that the officer knows "at the inception of the detention" support a finding of reasonable suspicion to support the detention, then "it is irrelevant" that the officer subjectively decided to detain the defendant "for a bad reason." *Duran*, 396 S.W.3d at 570.

*Analysis*

In determining whether the specific, articulable facts testified to by Grandy constituted reasonable suspicion to detain Berring, we must first determine when the detention occurred. A seizure does not occur until a person has been either physically forced to yield or has yielded to an officer's show of authority. *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (quoting *Terry*, 392 U.S. at 19 n.16); *Wade*, 422 S.W.3d at 668. The crucial test is whether, taking into account all of the circumstances, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his or her business. *Bostick*, 501 U.S. at 439; *Castleberry*, 332 S.W.3d at 467.

Here, as Berring walked away, Grandy gave a loud, verbal command for him to stop. This show of authority would have communicated to a reasonable person that he was not free to leave. *Johnson v. State*, 864 S.W.2d 708, 723 (Tex. App.—Dallas 1993) (en banc), *aff'd*, 912 S.W.2d 227 (Tex. Crim. App. 1995). However, Berring did not yield to Grandy's show of authority; rather, he began to run from Grandy. Berring was not detained until he fell in the adjacent parking lot and Rodriguez, followed by other officers, physically restrained him. *See California v. Hodari D.*, 499 U.S. 621, 626 (1991) (There is no seizure when a police officer yells "Stop" at a fleeing form that continues to flee.); *Johnson*, 864 S.W.2d at 724 (defendant who ran from police officer not seized until he complied with officers' orders to stop). Accordingly, in determining whether Grandy had reasonable suspicion to detain Berring, we consider all facts known to Grandy prior to Berring being detained in the adjacent parking lot. *See Duran*, 396 S.W.3d at 569; *Castleberry*, 332 S.W.3d at 467; *see also United States v. Franklin*, 323 F.3d 1298, 1301 (11th Cir. 2003) ("Because Franklin was seized when he was tackled, the officers can consider everything that happened up to that point to establish reasonable suspicion.").

Grandy observed a crowd of people standing, after dark, in front of the closed liquor store. *See Foster*, 326 S.W.3d at 613 (time of day is relevant factor in determining whether officer had reasonable suspicion to detain defendant). The store was located in a high crime area and was known as a location for "open air drug sales." *See Crain v. State*, 315 S.W.3d 43, 53 (Tex. Crim. App. 2010) (although not suspicious standing alone, criminal activity in area is factor to be considered in determining whether officer had reasonable suspicion to detain defendant). Further, the CRT had been charged with investigating a spike of burglaries and robberies in the area. *See id.* The liquor store had posted a "no loitering" sign and had completed a CTA authorizing the CRT to investigate possible criminal trespassing on the property.[2] Grandy intended to investigate whether any person in the crowd was engaged in criminal trespass by identifying each person in the crowd and determining whether that person had received a prior criminal trespass warning. Grandy's intention was reasonable in order to "maintain the status quo momentarily to obtain more information" concerning possible criminal activity. *See State v. Kerwick*, 393 S.W.3d 270, 276 (Tex. Crim. App. 2013) (quoting *Adams v. Williams*, 407 U.S. 143, 146 (1972)). As Grandy approached the crowd, Berring began walking away, looking constantly over his shoulder at Grandy. *See Balentine v. State*, 71 S.W.3d 763, 769 (Tex. Crim. App. 2002) (defendant appearing nervous and "walking briskly away" from direction of reported criminal activity "while constantly looking back over his shoulder" in police officer's direction was factor to be considered in reasonable suspicion analysis). When Grandy ordered Berring to stop, Berring began to run away. *See Illinois v. Wardlow*, 528 U.S.

---

[2] The record does not provide us a sufficient basis for determining how, or if, the CTA affects the reasonable suspicion analysis. Grandy did not testify about the specific warning that was given to any person found loitering on the premises of the Grand Liquor Store. Accordingly, we are unable to determine whether that warning constituted sufficient notice under the criminal trespass statute to support a reasonable suspicion that any person loitering at the Grand Liquor Store could be guilty of criminal trespass. *See* TEX. PENAL CODE ANN. § 30.05(a) (West Supp. 2013). We also need not address whether the sign posted at the Grand Liquor Store constituted a sufficient warning for purposes of the criminal trespass statute, *see* TEX. PENAL CODE ANN. § 30.05(a), but note that Berring admitted during oral argument that had the sign stated "No Trespassing," Grandy would have reasonable suspicion based on the totality of the circumstances to detain Berring at the point in time when Grandy exited his vehicle and approached the group of men standing in front of the liquor store.

119, 124 (2000) (defendant's unprovoked flight from officers in an area of heavy narcotics trafficking supported reasonable suspicion that defendant was involved in criminal activity and justified stop); *Matthews v. State*, No. PD-1341-13, 2014 WL 2589830, at *5 (Tex. Crim. App. June 11, 2014) (noting that defendant's flight increased officer's suspicion that defendant was engaged in illegal activity); *Kerwick*, 393 S.W.3d at 276 ("'[Flight] is not necessarily indicative of wrongdoing, but it is certainly suggestive of such' and may be considered among the totality of the circumstances in a reasonable-suspicion analysis." (quoting *Wardlow*, 528 U.S. at 125)).

Viewing the entire record in the light most favorable to the trial court's ruling, we conclude Grandy testified to specific, articulable facts that, when combined with reasonable inferences from those facts, would lead him to conclude that Berring was, had been, or soon would be engaged in criminal activity. Accordingly, the trial court did not err by denying Berring's motion to suppress. We resolve Berring's first issue against him.

### Admission of Medical Records

In his second issue, Berring contends the trial court erred by excluding medical records that were relevant to his defense. We review the trial court's admission of evidence under an abuse of discretion standard. *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011). As long as the trial court's ruling is within the "zone of reasonable disagreement," there is no abuse of discretion. *Id.*

Prior to trial, the prosecutor made an oral motion in limine, seeking to exclude any reference to injuries suffered by Berring during the altercation leading to his arrest or to Berring's medical records relating to the treatment of the injuries because the evidence was not relevant to any issue in the case. Berring argued the medical records were relevant to prove his identity and to support the defensive theory that the extent of his injuries made it impossible or impractical for him to have reached into his pocket and removed the bag containing crack

cocaine. The trial court granted the motion in limine and instructed Berring's counsel to approach the bench prior to asking questions about the medical records.

During the State's case-in-chief, Grandy testified Rodriguez was the first officer to overtake Berring. Grandy saw Berring trying to "buck" Rodriguez "off him." At that time, Grandy did not see any blood on Berring or that Berring had any missing teeth. However, Grandy was focused on officer safety and was not looking for blood or abrasions "in that split second." Grandy testified that he grabbed Berring's right arm and tried to take him to the ground with an "arm bar," but Berring continued to struggle. Roach and another officer arrived and helped Grandy and Rodriguez take Berring to the ground. Although Grandy denied that he punched Berring, he admitted that Berring was punched and kicked in the course of the struggle and that he kicked Berring in his right side. According to Grandy, Berring kept trying to reach into his right pocket. Grandy thought Berring might have a weapon and yelled that Berring was "reaching." Berring eventually pulled the bag that contained the crack cocaine out of his pocket. When the officers picked up Berring from the mud puddle, Grandy saw that Berring was bleeding from his mouth, and Berring said that he had lost some teeth. After Berring was booked into jail, he was seen by a nurse. The nurse instructed that Berring be taken to the hospital because his injuries were severe.

After Grandy testified, Berring's counsel requested a hearing on the issue of whether she could "go into" the injuries Berring sustained. The trial court first noted that Grandy had already testified, without an objection from the State, about Berring's "physical appearance or physical condition" at the time of the arrest. Berring's counsel argued the "injuries are the crux of our defense" and that it was their "theory that because Mr. Berring was injured, he could not have been able to reach into his pocket and pull out the drugs from his front pants pocket." Berring's counsel further argued that if she could not "cross examine the other officers on the injury, then

–10–

[the jury is] going to think I'm hiding something." After a recess, the trial court "sustain[ed] the State's objection in the motion in limine about going into the extent of the defendant's injuries as a result of the altercation with the police, takedown, arrest" because it was not relevant to Berring's guilt or innocence.

As pertinent to this issue, Rodriguez testified that, after Berring fell "face first" into the puddle, he got on Berring's back. Berring tried to throw Rodriguez off. Rodriguez then "came down with a closed fist" and struck Berring with both his right and left hands. Rodriguez was attempting a "brachial stun," but due to Berring's movements, "it was ineffective." Other officers arrived to help, and they eventually subdued Berring. Grandy alerted the other officers that Berring was reaching for his pocket. Rodriguez did not know whether Berring was armed.

Berring called Clifford Hamilton to testify for the defense. As relevant to this issue, Hamilton testified that he was sitting in his car watching the parking lot at the Manhattan Club on May 11, 2012 when he saw Berring run through the lot. Hamilton saw Berring fall face down in the parking lot. Two officers fell on top of Berring. The two officers put their knees on Berring's back. Another officer arrived and began kicking Berring in the head and face. Hamilton did not see Berring fight back against the officers.

During the State's rebuttal, Roach testified that he was assigned to the CRT and was a member of the team that went to the Grand Shopping Center on May 11, 2012. As relevant to this issue, Roach testified he saw Grandy and Rodriguez engaged in an altercation with Berring. Roach took his baton and "attempted to deliver three or four strikes to [Berring's] leg to help take him to the ground." Although the strikes were "ineffective," Grandy and Rodriguez eventually took Berring to the ground. Berring continued to struggle, and Roach knelt on Berring's upper left shoulder. Roach felt "movements" that could have been strikes to Berring's body. Grandy began yelling that Berring was "reaching." Concerned that Berring had a weapon,

–11–

Roach pulled out his gun to provide cover for the officers and pointed the gun at Berring. Roach did not see anyone kick Berring in the head and believed he would have known if somebody had kicked Berring in the head.

After the State completed its rebuttal, Berring requested to be allowed to introduce the medical records to rebut Roach's testimony that he did not see anybody kick Berring in the head. Berring offered the medical records "simply to confirm that he did, in fact have injuries to his face and nothing – nothing more, nothing less." The trial court sustained the State's objection to the request because "any value that might be flowed from those records would outweigh rebuttal possibility."

We conclude that, even if the trial court erred by refusing to admit Berring's medical records, Berring suffered no harm. Generally, errors resulting from admission or exclusion of evidence are nonconstitutional. *Walters v. State*, 247 S.W.3d 204, 219 (Tex. Crim. App. 2007).[3] Accordingly, we must disregard any error that did not affect Berring's substantial rights. TEX. R. APP. P. 44.2(b). Substantial rights are not affected if, based on the record as a whole, we have a fair assurance that the erroneous exclusion of evidence either had no influence or only a slight influence on the jury. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). In making our assessment, we consider everything in the record, including any evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the alleged error and how it relates to evidence in the record. *Id.* We may also consider the jury

---

[3] If the precluded evidence forms a vital portion of the defendant's case, the error may be of constitutional magnitude. *Walters*, 247 S.W.3d at 219; *Potier v. State*, 68 S.W.3d 657, 665 (Tex. Crim. App. 2002). As relevant to this appeal, the exclusion of evidence might rise to the level of a constitutional violation if a clearly erroneous ruling by the trial court results in the exclusion of admissible evidence that forms the vital core of a defendant's theory of defense and effectively prevents him from presenting that defense. *Walters*, 247 S.W.3d at 219. Although Berring argues on appeal that the medical records "would have provided vital support" for his defensive theory that his injuries made it impossible for him to reach into his pocket and that this "was a core issue for the jury in determining guilt," he does not argue that he was prevented from presenting his defensive theory and does not employ a constitutional harm analysis. We conclude that the exclusion of the medical records did not prevent Berring from presenting his defensive theory through the testimony of other witnesses. *See id.* at 221–22 (any error in exclusion of evidence was nonconstitutional because defendant was able to present his defense through other testimony). Accordingly, we apply the harm analysis for nonconstitutional error.

–12–

instructions, the State's theory and any defensive theories, closing arguments, and voir dire, if applicable. *Id.*

In his brief, Berring does not point to any specific information in the medical records that he claims would have impacted the jury's decision. Our review of the records shows that Berring arrived at the hospital at 12:47 a.m. complaining of dental pain, rib pain, and knee abrasions. Berring told emergency room personnel that he "blacked out" during the altercation, but the police indicated they did not witness any loss of consciousness. The emergency room personnel noted that Berring had multiple teeth missing and a minor amount of bleeding. Both of Berring's knees had abrasions, but he had no obvious facial trauma. An x-ray of Berring's ribs showed no fractures. Berring was discharged at 4:46 a.m.

The jury heard three police officers and Hamilton testify about the altercation that occurred while the officers were trying to arrest Berring. The officers admitted that Berring was held down, placed in an arm bar, punched, kicked, and hit with a baton. Hamilton testified that he saw two police officers holding Berring down and another officer kicking Berring in the face and head. Roach admitted that he held a gun on Berring. Grandy testified that, after the altercation, Berring's face was bloody and Berring stated that he had lost some teeth. Grandy further testified that, after Berring was booked into jail, the nurse instructed that Berring should be taken to the hospital due to the severity of his injuries. Berring's attorney argued during closing arguments that it was unbelievable that "Berring was on the ground and able to still fight with a gun in his head and reach into his front right pants pocket and grab out these drugs." She further argued that, due to the intensity of the altercation and the trauma inflicted on Berring, it was "almost a physical impossibility" that he reached into his pocket and pulled out the drugs. Berring clearly presented the jury with his defensive theory that he could not have had the drugs in his pocket.

–13–

After reviewing the record as a whole, we are reasonably assured that the exclusion of the medical records did not influence, or had only a slight effect on, the jury's verdict. Accordingly, Berring was not harmed by the exclusion of the medical records. We resolve Berring's second issue against him.

### Right to Allocution

In his third issue, Berring asserts the trial court erred by failing to afford him the right of allocution provided for by article 42.07 of the code of criminal procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 42.07 (West 2006) ("Before pronouncing sentence, the defendant shall be asked whether he has anything to say why the sentence should not be pronounced against him."). Texas Rule of Appellate Procedure 33.1(a) requires a complaining party to make a timely, specific objection to preserve error for appellate review. TEX. R. APP. P. 33.1(a). Here, Berring failed to object in the trial court that he was denied his right to allocution. Therefore, he failed to preserve error for our review. *See id.*; *Tenon v. State*, 563 S.W.2d 622, 623–24 (Tex. Crim. App. [Panel Op.] 1978); *Jarvis v. State*, 353 S.W.3d 253, 254–55 (Tex. App.—Fort Worth 2011, pet. ref'd).[4] We resolve Berring's third issue against him.

We affirm the trial court's judgment.

/Robert M. Fillmore/
ROBERT M. FILLMORE
JUSTICE

Do Not Publish
TEX. R. APP. P. 47

130326F.U05

---

[4] *See also Wilson v. State*, No. 05-12-00831-CR, 2013 WL 4399193, at *7 (Tex. App.—Dallas Aug. 15, 2013, no pet.) (not designated for publication).

–14–



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

LARRY BERRING, Appellant

No. 05-13-00326-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 2, Dallas County, Texas,
Trial Court Cause No. F-1255634-I.
Opinion delivered by Justice Fillmore,
Justices FitzGerald and Evans participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 18th day of June, 2014.

/Robert M. Fillmore/

ROBERT M. FILLMORE
JUSTICE