In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-16-00474-CR
_____

THE STATE OF TEXAS, Appellant

V.

ROBERT LEE ERSPAMER, Appellee

On Appeal from the County Court at Law No. 4
Montgomery County, Texas
Trial Cause No. 16-311932

MEMORANDUM OPINION

Appellee Robert Lee Erspamer (Erspamer or Appellee) was charged with driving while intoxicated. The trial court granted Erspamer's Motion to Suppress and the State appeals the trial court's order. In one issue, the State argues the trial court erred in granting the motion to suppress evidence. We affirm.

## Motion to Suppress

Erspamer filed a motion to suppress requesting the court to "suppress any and all evidence seized or obtained as a result of illegal acts on behalf of the Government in this DWI criminal prosecution which violated the defendant's rights as guaranteed him under both the federal and state constitutions and under state statutes." The motion asserted, among other things, that "[t]he seizure of the Accused was made without any reasonable suspicion that he was engaged in criminal activity[]" and the acquisition of evidence was not pursuant to a search or arrest warrant, was absent exigent circumstances, and made without probable cause to believe Erspamer was engaged in criminal activity.

At the hearing on the motion to suppress, Trooper Robert Oelsner testified that in the early morning hours of January 30, 2016, he was an officer with the Texas Department of Public Safety and was on patrol in Montgomery County. According to Trooper Oelsner he noticed "a pair of taillights" on a car on Old Houston Road that was in the grassy "median-type of area on the two-lane roadway." Trooper Oelsner testified that the taillights caught his attention because of the time of night, because on that road at that time there was "no reason for someone to be stopped unless they're . . . having vehicle issues[,]" and because the area was not well-traveled and dark. Trooper Oelsner explained that he was concerned for the welfare

of the person in the vehicle because of the time of night and because the area was known for criminal activity, and he "[w]ent over to ensure that they didn't need any help as far as a wrecker or changing of a tire or anything like that."

According to Trooper Oelsner, he pulled up on the roadway next to the vehicle's driver window, rolled his patrol car window down, and turned on his "alley light[]" to "see the occupants of the vehicle; make sure . . . everything was okay[.]" Oelsner stated that he did not turn on his flashing lights or display his weapon. Trooper Oelsner testified that Erspamer was in the vehicle alone, and Oelsner rolled his passenger window down and signaled for Erspamer to roll his window down. When Oelsner asked him if he was okay, Erspamer replied that he had "pulled over to check his Facebook." At the hearing Oelsner described Erspamer's demeanor as "kind of shocked . . . law enforcement had pulled up next to him[]" and that "he had a look of . . . confusion of . . . why is this officer coming over here." Trooper Oelsner testified that Erspamer exhibited the following signs of intoxication: red and bloodshot eyes, flushed face, and slurred speech. Erspamer told him that his destination was a residence half a mile away and, according to Trooper Oelsner, "it just didn't make sense for him to stop a half a mile from the house to check his Facebook[.]" Trooper Oelsner testified that due to "the high volume of intoxicated

3

drivers that are out [and] about [at] that time[]" and because "a lot of them take the back roads[,]" he decided to investigate further.

Trooper Oelsner testified that he put his patrol car in reverse, turned on his rear red and blue lights, got out, and told Erspamer to put his vehicle in park and to "step out with his driver's license." According to Trooper Oelsner, he turned his lights on because "[a]t that point, [Oelsner] felt that it was . . . time to detain [Erspamer] to further investigate . . . if he was intoxicated or not." Trooper Oelsner also testified that he noticed the odor of alcohol and asked Erspamer to step out of the vehicle so Oelsner could determine if the odor was coming from Erspamer. After confirming the odor of alcohol was coming from Erspamer, Oelsner had Erspamer perform field sobriety tests that confirmed Oelsner's suspicion that Erspamer had been driving while intoxicated. According to Trooper Oelsner, Erspamer's intoxication was later confirmed by blood test results. Trooper Oelsner explained that his dashboard camera recorded a video of his questioning of Erspamer but there was no audio for the initial encounter because Oelsner "didn't feel it necessary because [he] honestly thought it was a motorist assist . . . and didn't think that needed to be recorded or anything like that." The dashboard video recording was admitted into evidence.

4

During cross-examination, Trooper Oelsner acknowledged that when he first noticed Erspamer's vehicle, Oelsner did not believe Erspamer was engaging in any criminal activity, Erspamer had been lawfully parked on the shoulder of the roadway, Erspamer had not committed a traffic violation or violated any statute by parking on the side of the road, he had not shown any sign of needing medical assistance, Oelsner had not activated his emergency flashing lights, and neither Erspamer's appearance nor actions prior to talking to the officer indicated that Erspamer was in any kind of distress. Oelsner agreed that there was no indication that Erspamer's vehicle was in need of repair or experiencing mechanical failure. Oelsner agreed that when he pulled up to Erspamer's vehicle he could see the illumination of a phone. On cross-examination, Trooper Oelsner also acknowledged that Erspamer "complied with his command" to roll the window down and that after Oelsner had asked Erspamer the first question—if Erspamer was okay—Oelsner did not observe any signs of distress. Officer Oelsner agreed that if Erspamer had been in need of assistance Oelsner could see that Erspamer had access to a device that he could use to obtain assistance and that he could have walked a half mile back to the location he came from or a half mile to his destination to get assistance. Trooper Oelsner conceded that the route Erspamer was taking was consistent with the location he had come from and the location that he stated was his destination. After

5

reviewing the offense report, Trooper Oelsner agreed that he did not note on the report that Erspamer's speech was slurred. Trooper Oelsner also acknowledged that just because a person has a flushed face or bloodshot eyes does not necessarily mean they are intoxicated and that those characteristics alone would not cause him to necessarily assume a person is intoxicated.

After granting Erspamer's motion to suppress, the trial court entered findings of fact and conclusions of law. The findings and conclusions relating to whether the initial encounter was consensual included the following:

Findings of Fact

. . . .

[] Robert Oelsner, who was a Trooper for the Texas Department of Public Safety at the time of the defendant's arrest and was a Magnolia Police Department Officer at the time of the suppression hearing, was a credible witness at the hearing on the motion to suppress.

. . . .

[] The Trooper's initial encounter with the defendant did not constitute a consensual encounter outside the scope of the Fourth Amendment's protections. *See Wade v. State*, 422 S.W.3d 661 (Tex. Crim. App. 2013); *Castleberry v. State*, 332 S.W.3d 460 (Tex. Crim. App. 2011).

[] The Court finds that based on the evidence and the credibility of the witness that no reasonable person in this situation would have felt free to disregard the command by a uniformed police office[r] in a marked police vehicle to stop his actions and roll []his window down to talk to the officer or to disregard the command and leave.

6

. . . .

[] After considering and weighing the credibility of the evidence and the witness, the Court finds that Erspamer's compliance with the Trooper's command to roll down the window and talk to the Trooper was acquiescence to lawful authority and was not a purely consensual encounter.

[] After considering and weighing the credibility of the evidence and the witness, the Court finds that Erspamer yielded to the Trooper's display of authority by responding to his commands and answering his questions. Erspamer told the Trooper that he was "okay and that he pulled over for a few minutes to check his Facebook." Whatever interest there was in community caretaking, ended following Erspamer's answer.

. . . .

Conclusions of Law

. . . .

[] The Trooper's initial encounter with the defendant did not constitute a consensual encounter outside the scope of the Fourth Amendment's protections. *See Wade v. State*, 422 S.W.3d 661 (Tex. Crim. App. 2013); *Castleberry v. State*, 332 S.W.3d 460 (Tex. Crim. App. 2011).

[] Erspamer was detained when he acquiesced to the Trooper's show of lawful authority both at the inception of it and during the time it continued following the Trooper's initial question of whether Erspamer "was okay."

[] Erspamer's detention was unlawful[] because there was not reasonable suspicion that Erspamer had been, was, or about to be involved in criminal activity, the detention violated the Fourth Amendment of the United State[s] Constitution and Article 1 section 9 of the Texas Constitution and all evidence thereafter obtained as a result of the unlawful detention was unlawfully obtained and is suppressed.

7

[] The expansion of the initial contact and detention into a DWI investigation was unlawful because, at its inception, there was not reasonable suspicion to believe that Erspamer was driving while intoxicated and all evidence thereafter obtained as a result of it was unlawfully obtained and is suppressed.

[] Trooper's initial encounter with the defendant constituted an illegal detention that mandates suppression of evidence obtained as a result of the unlawful seizure.

## Issue on Appeal

The State argues that Trooper Oelsner's initial contact with Erspamer constituted a consensual encounter, "and, therefore, did not fall under Fourth Amendment scrutiny—up until the point Oelsner activated his overhead flashing lights and pulled behind" Erspamer. The State asserts that by the time Oelsner detained Erspamer, reasonable suspicion justified the detention. According to the State, Oelsner observed factors prior to detaining Erspamer that reasonably support Oelsner's conclusion that Erspamer may have been involved in criminal activity, and Oelsner was warranted in detaining Erspamer to investigate a potential DWI.

## Standard of Review

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Ford v. State*, 158 S.W.3d 488, 493 (Tex. Crim. App. 2005). In reviewing the trial court's decision, we do not engage in our own factual review.

8

*Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990). The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony at a suppression hearing. *Wiede v. State*, 214 S.W.3d 17, 24-25 (Tex. Crim. App. 2007); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). Therefore, we give almost total deference to the trial court's rulings on (1) questions of historical facts, even if the trial court's determination of those facts was not based on an evaluation of credibility and demeanor, and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Montanez v. State*, 195 S.W.3d 101, 108-09 (Tex. Crim. App. 2006); *Johnson v. State*, 68 S.W.3d 644, 652-53 (Tex. Crim. App. 2002). But when the application-of-law-to-fact questions does not turn on the credibility and demeanor of the witnesses, we review the trial court's rulings on those questions de novo. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson*, 68 S.W.3d at 652-53.

Stated another way, when reviewing the trial court's ruling on a motion to suppress, we must view the evidence in the light most favorable to the trial court's ruling. *Wiede*, 214 S.W.3d at 24; *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When the trial court grants a motion to suppress and files accompanying findings of fact and conclusions of law, and the sole witness at the motion to suppress

9

hearing is the arresting officer, the only question before us is whether the trial court properly applied the law to the facts it found. *See State v. Gray*, 158 S.W.3d 465, 467, 469 (Tex. Crim. App. 2005); *Guzman*, 955 S.W.2d at 86-87, 89. We must uphold the trial court's ruling if it is supported by the record and correct under any theory of law applicable to the case, even if the trial court gave the wrong reason for its ruling. *See State v. Stevens*, 235 S.W.3d 736, 740 (Tex. Crim. App. 2007); *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003), *cert. denied*, 541 U.S. 974.

Determining whether a given set of facts amounts to a consensual encounter or a detention under the Fourth Amendment is an issue of law. *Johnson v. State*, 414 S.W.3d 184, 192 (Tex. Crim. App. 2013). The application of legal principles to a specific set of facts is an issue of law and is subject to de novo review. *Id.* Thus, whether Trooper Oelsner's initial interaction with Erspamer constituted a consensual encounter or an illegal detention is subject to de novo review. *See id.*

Applicable Law

The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures. U.S. Const. amend. IV. A temporary detention for purposes of investigation constitutes a seizure for Fourth Amendment purposes. *See Terry v. Ohio*, 392 U.S. 1, 16 (1968). However, not every encounter between a

10

civilian and a police officer implicates the Fourth Amendment. *See Florida v. Bostick*, 501 U.S. 429, 434 (1991); *Hunter v. State*, 955 S.W.2d 102, 104 (Tex. Crim. App. 1997).

"There are three distinct categories of interactions between police officers and citizens: (1) encounters, (2) investigative detentions, and (3) arrests." *Crain v. State*, 315 S.W.3d 43, 49 (Tex. Crim. App. 2010). Unlike an investigative detention or an arrest—each a seizure for Fourth Amendment purposes—an encounter is a consensual interaction, which the citizen may terminate at any time." *See Gurrola v. State*, 877 S.W.2d 300, 302-03 (Tex. Crim. App. 1994). As a general rule, when an officer through force or a showing of authority restrains a citizen's liberty, the encounter is no longer consensual. *State v. Woodward*, 341 S.W.3d 404, 410-12 (Tex. Crim. App. 2011). "This is the point at which an encounter becomes a detention or arrest, both of which are seizures under the Fourth Amendment." *Id.* at 411. In determining whether a reasonable person would have felt free to leave, we look at the officer's conduct as well as the setting in which the police-citizen interaction takes place. *Crain*, 315 S.W.3d at 51; *State v. Garcia-Cantu*, 253 S.W.3d 236, 244 (Tex. Crim. App. 2008).

Analysis

Oelsner testified on direct examination that he "signaled" for Erspamer to roll his window down. Oelsner was asked on cross-examination whether Erspamer "complied with your display of law enforcement authority and complied with your command and rolled down the window," and Trooper Oelsner responded, "Yes, sir."

After considering and weighing the credibility of the witness, the trial court made a specific finding of fact that Erspamer complied with Trooper Oelsner's show of authority and command to roll down the window and talk to him.[1] Depending upon the circumstances, a detention occurs when a person in a parked car complies with a police order to roll down the window, open the door, or get out of the car. *Ebarb v. State*, 598 S.W.2d 842, 850 (Tex. Crim. App. 1980) (op. on reh'ing); *Ex*

---

[1] The State cites to *State v. Saenz*, 411 S.W.3d 488, 494 (Tex. Crim. App. 2013), in arguing that this Court "need not defer to the trial court's purported finding of fact that Oelsner 'commanded' the appellee to roll down his window, because the only mention of a 'command' was intertwined within legal conclusions to be reviewed *de novo*." The trial court's findings of fact included that Oelsner commanded Erspamer to roll his window down and that Erspamer yielded to Oelsner's display of authority by rolling down his window and talking to him. *See State v. Sheppard*, 271 S.W.3d 281, 291 (Tex. Crim. App. 2008) ("[F]actual findings are who did what, when, where, how or why.") This finding explained the what, how, and why of Erspamer's reaction in rolling down the window and talking with Trooper Oelsner. *See, e.g.*, *State v. Nelson*, No. 13-13-00085-CR, 2014 Tex. App. LEXIS 1580, at \*\*9, 18 (Tex. App.—Corpus Christi Feb. 13, 2014, pet. ref'd) (mem. op., not designated for publication) (applying the law to the trial court's finding of fact and concluding that the defendant yielded to the officer's show of authority).

*parte Nieves*, No. 08-11-00189-CR, 2013 Tex. App. LEXIS 9067, at *17 (Tex. App.—El Paso July 24, 2013, no pet.) (mem. op., not designated for publication); *Tex. Dep't of Pub. Safety v. Adkins*, No. 11-10-00298-CV, 2012 Tex. App. LEXIS 6814, at *11 (Tex. App.—Eastland Aug. 16, 2012, no pet.) (mem. op., not designated for publication); *Martin v. State*, 104 S.W.3d 298, 301 (Tex. App.—El Paso Apr. 24, 2003, no pet.). The State acknowledges this line of cases, but instead argues that Oelsner testified he "signaled" for Oelsner to roll his window down which does not amount to a detention. *See, e.g.*, *Soto v. State*, No. 05-07-00029-CR, 2007 Tex. App. LEXIS 8327, at *4 (Tex. App.—Dallas Oct. 22, 2007, pet. ref'd) (mem. op., not designated for publication) (no detention where officer "directed," rather than ordered, defendant to roll down window); *Ashton v. State*, 931 S.W.2d 5, 7 (Tex. App.—Houston [1st Dist.] 1996, pet. ref'd) (no investigatory detention when officer approached defendant sitting in parked car and asked her to roll down her window); *see also Merideth v. State*, 603 S.W.2d 872, 873 (Tex. Crim. App. [Panel Op.] 1980) (detention does not occur if an officer merely approached a parked vehicle and knocks on the window).

The trial court, however, as the sole trier of fact and judge of the credibility of the witnesses, apparently believed Oelsner's acknowledgement on cross-examination that Erspamer had complied with Oelsner's show of authority and that

13

Oelsner made a "command" to roll down the window. *See Ross*, 32 S.W.3d at 855 (At a suppression hearing, the trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony and may accept or reject all or any part of a witness's testimony.). This is a finding of fact and incident to the trial court's impression of the credibility of the witness. The finding is supported by the testimony during cross-examination, and our focus is limited to a determination of whether the trial court's conclusions of law flow from this factual finding. *See Gray*, 158 S.W.3d at 467, 469 (once trial court has made specific findings of fact, a court of appeals reviews the ruling on the motion to suppress "without infringing on the trial court's discretion to determine the facts"); *Guzman*, 955 S.W.2d at 86-87, 89.

Based upon the findings of fact that are supported by the record, we cannot say the trial court erred in concluding that the encounter did not constitute a consensual encounter outside the scope of the Fourth Amendment's protections.[2] *See Ebarb*, 598 S.W.2d at 850. We overrule the State's issue on appeal and affirm the trial court's order.

---

[2] Because the State does not argue on appeal that, even if the encounter was not consensual, Trooper Oelsner's exercise of his community caretaking function justified his detention of Erspamer, we need not address the trial court's additional findings regarding Oelsner's exercise of his community caretaking function. *See* Tex. R. App. P. 47.1.

AFFIRMED.

_____<br>
LEANNE JOHNSON<br>
Justice

Submitted on June 14, 2017
Opinion Delivered August 2, 2017
Do Not Publish

Before McKeithen, C.J., Horton and Johnson, JJ.

15