

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-22-00328-CR

Alexander Scott **HALEY**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 216th Judicial District Court, Kerr County, Texas
Trial Court No. A20161
Honorable Albert D. Pattillo, III, Judge Presiding

Opinion by:    Lori I. Valenzuela, Justice

Sitting:    Irene Rios, Justice
Beth Watkins, Justice
Lori I. Valenzuela, Justice

Delivered and Filed: July 19, 2023

JUDGMENT MODIFIED; AFFIRMED AS MODIFIED

A jury convicted appellant, Alexander Scott Haley ("Haley"), of murder and assessed punishment at life in prison. On appeal, Haley challenges the denial of his motions to suppress. We modify the judgment to delete the assessment of attorney's fees and affirm as modified.

**PROCEDURAL BACKGROUND**[1]

Before trial, Haley's counsel filed motions to suppress his written and/or oral statements and illegally seized evidence. Following a hearing on the motions, at which several witnesses testified, the trial court denied the motions and issued findings of fact and conclusions of law. After a jury trial, the jury found Haley guilty of murder and assessed punishment at life in prison. The trial court signed a judgment that included requiring Haley to pay $15,000 in attorney's fees. On appeal, Haley asserts the trial court erred by (1) denying his motions to suppress, (2) denying him the opportunity to present evidence on his mental illness and the voluntariness of his statements, and (3) assessing attorney's fees because he is indigent.

**MOTION TO SUPPRESS**

Haley asserts the trial court erred by denying his motions to suppress because (1) the officers did not have reasonable suspicion to stop and approach him; (2) even if the initial encounter was consensual, it became a detention when his freedom to leave and end the interaction was restricted; and (3) he invoked his right to counsel; therefore, his statements are inadmissible.

**A.      Standard of Review**

We "review a trial court's ruling on a motion to suppress for an abuse of discretion under a bifurcated standard of review." *State v. Torres*, 666 S.W.3d 735, 740 (Tex. Crim. App. 2023). "We give almost total deference to the trial court's findings of fact and review de novo the application of the law to the facts." *State v. Ruiz*, 577 S.W.3d 543, 545 (Tex. Crim. App. 2019); *Furr v. State*, 499 S.W.3d 872, 877 (Tex. Crim. App. 2016) (holding we afford "almost complete deference to the trial court's determination of historical facts, especially when those determinations are based on assessments of credibility and demeanor"). "When a trial judge makes express

---

[1] Haley does not challenge the sufficiency of the evidence in support of his conviction. Therefore, we recount any relevant factual background in the sections discussing his issues on appeal.

findings of fact, an appellate court must examine the record in the light most favorable to the ruling and uphold those fact findings so long as they are supported by the record." *State v. Rodriguez*, 521 S.W.3d 1, 8 (Tex. Crim. App. 2017); *State v. Kerwick*, 393 S.W.3d 270, 274 (Tex. Crim. App. 2013) ("When, as here, the trial court rules on a motion to suppress and makes explicit factual findings, an appellate court must determine whether the findings are supported by the record."). We "then proceed[] to a *de novo* determination of the legal significance of the facts as found by the trial court . . . ." *Rodriguez*, 521 S.W.3d at 8.

## B.    Factual Background

At about 7:00 a.m. on July 10, 2019, Louis Vaughan was assaulted and Kerrville Police Department officers were advised there was a possible suspect, described as a male with a black rolling bag, who might be in a park. Multiple officers began a canvass for someone who might have information about the assault. Kerrville Police Officer Juan Diaz testified he was on traffic duty when he was notified of a suspicious person under a bridge who had a rolling suitcase. He did not know any other details about the assault, but he was looking for a male with a rolling suitcase and wearing a bandana. Diaz was the first officer to contact Haley at about 12:25 p.m.

When he first saw Haley in the park under a bridge, Haley was not wearing a bandana or in possession of a black suitcase. However, a suitcase of a "dark color," which he thought was blue, was next to Haley. Diaz agreed neither wearing a bandana in the hot summer months nor having a suitcase indicated criminal activity, although having a suitcase might indicate someone was homeless. Diaz did not know when other officers were dispatched to the area, but he admitted that shortly after he exited his patrol car to approach Haley, Haley was surrounded by three officers. Diaz agreed that about one minute after approaching Haley, who was sitting on a low wall, there was one officer standing to Haley's left, an officer standing in front of him, and an officer standing to his right. Diaz said he never told Haley he could or could not leave.

He said Haley was "pretty relaxed, friendly," and cooperative. Diaz asked for and received Haley's identification card and he began to question him. Diaz did not *Mirandize* Haley or have a search warrant, but he asked Haley if he could look inside the suitcase. He said he did not tell Haley that he could refuse the request because Haley immediately agreed to the search. Diaz said Haley gave no indication he wanted to leave or not talk to anyone and he gave his consent willingly. After Haley gave his consent, another officer (Officer Jacob Trevino) began to search the bag. Diaz said he did not accuse Haley of anything or threaten to arrest him or take him to jail. Eventually investigators arrived on the scene and Diaz stepped away.

Kerrville Police Officer Jacob Trevino began his testimony with the scene of the assault. He testified he was on patrol on July 10, 2019 when he was dispatched for a welfare check on someone who was sleeping in the park and had a head wound. He said he was the first on the scene at about 8:12 a.m. and, when he found the man later identified as Vaughan, there was a significant amount of blood and the man was nonresponsive. Emergency personnel, who were already on the scene, said it appeared the man had been beaten. At the scene, Trevino observed shoe prints near the body, which were not left by emergency personnel or the police, and clothing and other belongings strewn about. The tread pattern of the shoe prints was identified as belonging to a Nike Monarch tennis shoe.

Trevino said the police were familiar with Vaughan because he was an alcoholic and homeless. Therefore, they believed Vaughan might have been with another homeless person and they wanted to locate and speak with this person to obtain information about the assault. At this point, patrol officers began the canvass to locate anyone with information. Trevino said they "were looking for this particular individual that could have had the shoe"; and they were told "someone that matched the information might have been down there, so we all kind of converged down there to make sure we could find this person, which turned out to be Mr. Haley."

- 4 -

Trevino said he arrived under the bridge at around 12:30 p.m., shortly after Haley was first contacted by Diaz. He described Haley as "really chill"; he "was just hanging out on the . . . rocks there and was talking to us"; "he was not uncooperative, loud, or disrespectful"; and "he was just holding a conversation when we were sitting there with him." Trevino agreed they searched Haley's suitcase after Haley said, "be my guest," and Haley never withdrew his consent. Trevino said he saw "a pretty decent amount of blood" on the outside of the suitcase and, upon further search, a pair of tennis shoes that had what appeared to be specks of blood on them. Inside the suitcase, Trevino found a smaller bag that he identified as belonging to Vaughan. Trevino described Haley's knuckles on his left hand as swollen with "little scrapes," which he said was consistent with hitting or punching something. He said the tread pattern on the shoes in the suitcase appeared consistent with the tread pattern found at the scene of the assault. At no point did he tell Haley he was under arrest, going to jail, or in trouble. Haley did not ask to leave or to stop the search of the suitcase.

On cross-examination, Trevino agreed that prior to the search, Haley was not *Mirandized*, not told he had the right to refuse the search or limit the search, and no written consent was obtained. Trevino said Haley was free to leave, but Haley was not told he could leave at any time. After searching the suitcase, finding blood on the bag and shoes, and finding Vaughan's smaller bag, Haley was detained in handcuffs.

Detective Ben Ledesma testified the initial call came from a park employee who said there was a person in the park carrying a rolling suitcase that matched the description originally given to the police. Ledesma said he was present when the suitcase was searched and Haley was very cordial, cooperative, and polite. Haley did not ask if he could leave and he was not told he could not leave or that he was a suspect. Ledesma remembered that Haley did not waver when he gave his consent and it was as if he was "just trying to help."

Ledesma testified that when Diaz asked Haley if an officer could search his suitcase, he was standing directly in front of Haley, Diaz was to his right, and Trevino was to his left. Ledesma confirmed Haley was not *Mirandized* or informed of his right to deny or limit the search. Furthermore, Haley was not *Mirandized* after he was handcuffed and placed in the back of Ledesma's patrol car. Before being placed in the patrol car, Haley, who was shirtless, asked "a couple of times" if he could put on a shirt. Ledesma did not have an extra shirt and did not take one from Haley's bag because it was, by now, possible evidence.

Ledesma testified he had several contacts with Vaughan, including arresting him. He stated that, during the search of the suitcase, he saw things he believed were relevant to the assault. Ledesma recognized the smaller bag inside Haley's suitcase as belonging to Vaughan because he had seen Vaughan with the smaller bag a few days earlier and because he had searched the bag several times when he arrested Vaughan.

Ledesma said Haley was detained in handcuffs because Ledesma saw the blood on the shoes and he believed Haley was not only a suspect, but possibly the person who assaulted Vaughan.[2] Haley was taken in Ledesma's patrol car to the Kerrville Police Department. Ledesma said Haley agreed to go. Once at the station, Haley was taken to an interrogation room. Ledesma said that when Haley asked to go to the restroom, he was taken to the same room where officers keep their personal belongings and he was not handcuffed. The door to the interview room was not locked.

Ledesma testified that when Haley was first brought into the interview room, while still handcuffed, he asked "where's my lawyer." When Ledesma was asked if he understood that to mean Haley wanted a lawyer, Ledesma replied he did not know what Haley expected. Ledesma

---

[2] Ledesma said he handcuffed Haley when another investigator said, in a voice loud enough for Haley to hear, "hook him up."

stated that if Haley had tried to walk out of the interview room, he would have told Haley he needed to be escorted out because he could not "just walk around aimlessly in the building."

Sargent James Machetta, with the Kerrville Police Department Criminal Investigation Unit ("CIU"), was the last witness called by the State. On July 10, 2019, he was an investigator with the CIU and he was called out to the scene of the assault at around 8:00 a.m. He also saw the shoe prints and, along with other officers, determined the prints were present before law enforcement and first responders arrived. He said patrol officers were looking for a homeless person in the area. Machetta characterized Vaughan's injuries as consistent with him having been hit multiple times with something.

When Machetta arrived at the location where Haley was found under the bridge, Haley was sitting on a rock embankment talking to other officers, he was cooperative, and he did not appear agitated. Machetta walked up to Haley and shook his hand. After watching the portion of a video showing Haley being asked if he was willing to go to the police station, Machetta was asked about Haley's response:

> Q. What did he say there as you were getting up and walking out?
> A. It sounded like he said he'd be willing to go with us, or roll with us or something.
> Q. Okay. During this interaction, did he – I know at first he said, I'd rather not. And you had mentioned, you know, I've got some stuff to hash out with you, come with me. And he said, I'm willing to go with y'all. Did he give you any indication that he changed his mind or he didn't want to talk to you?
> A. No, sir.
>
> . . .
>
> Q. Okay. And there's a reference to a lawyer on scene, you know, there. Did you take that to mean he didn't want to talk to you?
> A. No, sir. He just asked.
> Q. Okay.
> A. Just that he'd asked if there was a lawyer.

Machetta decided to handcuff Haley when the officer searching the bag found a bloody shirt. Machetta did not tell Haley he was a suspect or under arrest. Machetta said Haley was detained in handcuffs for the purpose of transporting him to the police station. When Machetta

arrived in the interview room at the police station, he uncuffed Haley, told him he was not free to leave, and read Haley his *Miranda* rights. Machetta testified he asked Haley about his earlier reference to a lawyer because he wanted to clarify that once Haley was *Mirandized* he would be willing to talk to him. Machetta said Haley agreed to talk to him. After some questioning, Haley finally said "I want a lawyer." Machetta then left the interview room and Haley was not questioned further.

On cross-examination, Machetta was questioned about whether Haley was free to leave while everyone was still at the location under the bridge:

> Q. And so at that point Mr. Haley wasn't free to leave, correct?
> A. He was – that was a time – it was kind of a – things were coming as I – so initially when I got there, he was – he wasn't in custody or detained, per se. But as things progressed then, yeah, his – his detention occurred.
> Q. So when you got there, you found out that there's bloody evidence, shoes that connect him to the scene, but – so at that point, when you know that, he's not free to get up and just walk away with those items belonging to him, correct?
> A. Not at that time, no. Once I learned that evidence, no.

Machetta was then questioned about Haley's mention of a lawyer while under the bridge:

> Q. . . . Mr. Haley asked, do I get a lawyer, correct?
> A. Something to that effect, yes.
> Q. Specifically he said, "Do I get a lawyer or anything," correct?
> A. I guess, yes.
> . . .
> Q. Okay. So then you tell Mr. Haley, if you want a lawyer, you can have a lawyer. If you think you need a lawyer, that's up to you, correct?
> A. Yes.
> Q. So at that point you're acknowledging Mr. Haley's asking, do I get a lawyer, can he have a lawyer, he's requesting one?
> A. I didn't feel that that was an unequivocal request for counsel at that point. He was asking me a question, just whether a lawyer was there or where his lawyer was at.
> Q. Well, you go on and he says – Mr. Haley states that, any time you talk to the police you need one, correct?
> A. Yes, he does state that.
> Q. So he's making his belief that if you talk to the police you need a lawyer present, he's making that belief apparent to you, correct?
> A. Yes.
> . . .

- 8 -

Q. Officer Holloway asked . . . how are you going to handle that, correct?
A. Yes.
Q. And he asks, does he get a lawyer, correct?
A. Yes.
Q. So Mr. Holloway is acknowledging Mr. Haley's request, correct?
A. He's asking for guidance and how this should be handled.
Q. So he's acknowledging it?
A. That's fair, yes.

. . .

Q. . . . Specifically you tell Officer Holloway, I say we take him up there and talk to him. If he wants a lawyer, I'll read him his rights.
A. Yes.

In addition to the testimony at the hearing, the trial court also viewed the footage from the officers' body cameras and car cameras. The first video is from a patrol car camera and shows Diaz driving up to where Haley was sitting on a low rock wall. Haley was shirtless and barefoot, a large-sized soda cup sat on the wall next to him, and his suitcase was on the ground next to him. Diaz exited his patrol car and approached Haley alone. A few minutes later, three other officers are shown walking up to Haley. The officers are all in uniform and they do not draw their weapons. Diaz at some point steps away, one officer remains standing next to Haley, who sips on his drink, while another officer is shown kneeling on the ground next to Haley's suitcase (it appears he was searching the suitcase). Haley appears calm and undisturbed by the encounter. A few minutes later, Machetta and Trevino arrive, both in plain clothes.

The next video of the initial encounter contains sound from the conversations with Haley. Diaz asked Haley if he had "anything weird" in the suitcase and asked if he could search it. Haley responded, "be my guest." When asked his name, he responded freely. While one of the officers searched the suitcase, Haley and two other officers engaged in what appears to be casual conversation. When Haley was asked how he got all the blood on the side of the suitcase, he gestured to the suitcase and said, "I found that on the side of the road." He said he had the suitcase

for "a couple of days." At some point, an officer asked Haley what happened to his hand and Haley responded that he did push-ups.

When Holloway and Machetta arrived, they were told about the blood and Haley's swollen hand. Machetta approached Haley and shook his hand. Machetta sat on the wall next to Haley while Holloway stood next to them. During the search, Haley asked the officers to retrieve his lighter from the suitcase and he lit up a cigarette. Haley continued to sip on his drink and smoke a cigarette. He appeared relaxed, calm, and undisturbed by the interaction with the officers or the search of the suitcase. Also during the entire encounter, anywhere from one to five officers milled about near Haley. With the exception of one car a few feet from Haley and the officers, all other cars were parked a distance away. At no time did Haley ask that the search stop or be limited. In fact, much of the time he was not watching the search. The video shows the entire search of the suitcase and Haley is shown being placed in handcuffs, at which time he asks only if he can put on his shirt (he is told "no"). The next video is from the inside of the patrol car transporting Haley to the police station. He and the officer do not speak to one another.

The next video shows the conversation between Machetta and Haley while still under the bridge. The video shows Machetta approaching Haley, saying "how ya doing brother," and asking Haley for his name and if he was from Kerrville. Haley responded with his name ("Alexander") and said he was from Bandera. When Machetta asked Haley if he knew why they were talking, Haley responded, "the golf cart guy" who was watching him and was paranoid about the homeless. Haley told Machetta he was "on this side of the river" the night before. When Machetta asked Haley if he would be willing to come down to the police department to talk, Haley said he would "rather not." Machetta then said, "we need to hash out some things," so we can "all be on the same page," and be honest with one another.

After showing more of the search of the suitcase, Machetta can be heard saying "hook him up" at which point Haley was handcuffed. The remainder of the video shows the search of the suitcase and the officers photographing its contents. Someone can be heard saying Haley was shaking the entire time and "he knows why we're here." Machetta told an officer to pack up the suitcase and take it back to the police department where it would be checked into evidence. Machetta said he would get a search warrant.

The next video begins in the interview room. The video shows Haley brought into the room in handcuffs and asked if he has anything harmful on him. Almost immediately, Haley asked, "where's my lawyer" and Machetta replied, "we'll get there," "we're just making sure you don't have anything on you." Machetta exited the room briefly and when he returned, he removed Haley's handcuffs and sat at the table across from Haley. Machetta told Haley he was not free to leave and that he was going to read Haley his *Miranda* rights. After each right, Machetta asked if Haley understood and Haley appeared to nod yes. When Machetta finished reading the rights, he asked, "with that being said, do you want to tell me why we're here talking today?" Haley responded, "the golf cart guy." Haley asked for his prescription glasses "to help defuse the situation." When his glasses were given to him, he laid them on the table.

Machetta then told Haley it was "up to" him if he wanted to talk, and Haley responded, "we can talk." Machetta then stated, "you mentioned a lawyer . . . earlier, if you want to talk without your lawyer and we can resolve this issue . . . ." Haley interrupted and stated, "you're asking me why I'm here, I don't know why I'm here." Machetta told him there was an incident earlier where a man was assaulted and he asked Haley if he knew anything about that. Haley responded, "no, I do not." Machetta asked why there was blood all over the rolling suitcase, and Haley said he did not know. Machetta asked if he wanted to explain and Haley said he did not remember, maybe his "body did something while he was blacked out." Machetta continued to

question Haley, who answered each question without hesitation. After several minutes, Haley said, "I want a lawyer," and Machetta said "you want a lawyer? Ok, you want a lawyer." Haley responded, "you're pushing for answers, I don't have any answers," "get me a lawyer." Machetta agreed to get him a lawyer but then asked, "is your lawyer going to help you remember these things?" Haley replied, "no, my lawyer is going to help me walk away from this." Machetta asked Haley if he had a lawyer, Haley said he did not and he reminded Machetta that he was entitled to a court-appointed lawyer. Machetta said "ok," and left the room. The next video shows an officer handcuffing Haley, who by this time is relaxing on the floor under the table, and telling Haley he was under arrest.

The State rested after Machetta testified, and the defense called six witnesses, all of whom were employed by the Kerrville Parks Department on July 10, 2019 and none of whom remembered calling the police on that date. Both sides then closed. Following the hearing, the trial court made a number of findings, including the following:

> 18. Officer Diaz made consensual contact with the Defendant and asked him for his identification. Officer Diaz found the Defendant to be friendly, relaxed, and cooperative.
> . . .
> 20. The Defendant voluntarily gave Officer Diaz his identification.
> . . .
> 22. Officer Diaz asked the Defendant if they could search his suitcase. The Defendant willingly consented and said "be my guest."
> . . .
> 28. During this time, the Defendant was polite, cooperative, made small talk with the officers; did not ask to leave, or give any indication he did not want to interact with law enforcement. Officers did not place him in handcuffs, did not tell him he couldn't leave, or restrict his movements in any way.
> . . .
> 30. Inv. Machetta introduced himself to the Defendant and asked him if he would be willing to accompany him to the police department so they could sit down and talk.
> 31. The Defendant asked Inv. Machetta if he was going to "have a lawyer ready for me when I get there?" Inv. Machetta responded that if the Defendant wanted a lawyer he could have one and that if the Defendant thought he needed a lawyer that was up to him.

32. The Defendant told Inv. Machetta that he would "rather not" go to the police station but then later told Inv. Machetta that he "was willing to go with y'all."

33. During this conversation with Inv. Machetta, the Defendant was not handcuffed, was not told he wasn't free leave, was not told that he was under arrest or would be arrested, and did not have his freedom of movement restricted in any way.

. . .

37. Inv. Machetta re-approached the Defendant and asked him again if he "was good with coming back to the police department and talking" with him after he finished smoking his cigarette. The Defendant shook his head yes.

38. The Defendant voluntarily agreed to accompany Inv. Machetta to the police station so Inv. Machetta could talk with him.

. . .

45. At no point before the Defendant was placed in handcuffs was he told he was under arrest, that he was going to jail, or that he could not leave, or have his freedom of movement restricted by any of the officers who were at the scene under the bridge at the park.

46. At no point before the Defendant was placed in handcuffs did he ask to leave or give any indication that he wanted to terminate his encounter with the police.

47. At no point after he was detained in handcuffs at the park was the Defendant told he was under arrest.

48. At no point while officers were searching his suitcase did the Defendant withdraw consent or limit the scope of his consent to search his suitcase.

49. Inv. Machetta made the decision to detain the Defendant in handcuffs after officers had observed blood on the side of the Defendant's suitcase, discovered the Nike Monarch shoes with blood on them, Vaughan's black bag, and the t-shirt with blood stains inside of his suitcase, and after noticing that the Defendant's left hand was swollen.

50. Inv. Machetta made the decision to detain the Defendant in handcuffs for officer safety purposes and so the Defendant could be safely transported to the police station for an interview.

. . .

54. Shortly after the Defendant was seated in the interview room the Defendant asked Inv. Machetta "where's my lawyer?" Inv. Machetta responded "we'll get there."

. . .

57. Inv. Machetta told the Defendant that because he was not free to leave, he needed to read the Defendant the statutory warnings set out in article 38.22 of the Code of Criminal Procedure before the interview began.

58. The Defendant understood the article 38.22 warnings and each of his rights set out in those warnings.

59. Inv. Machetta asked the Defendant if he wanted to talk to him since he "mentioned the lawyer issue earlier." The Defendant responded "we can talk."

60. The Defendant voluntarily made the decision to talk to Inv. Machetta after being advised of, and understanding, the statutory warnings set out in article 38.22 of the Code of Criminal Procedure.

61. At one point during the interview the Defendant told Inv. Machetta that he wanted a lawyer. Inv. Machetta ended the interview.

. . .

63. Inv. Machetta left the interview room to draft an arrest warrant for the Defendant for assaulting Vaughan.

64. At no point before or during the interview was the Defendant told that he was under arrest or that the Defendant was going to be arrested or charged with any crime.

. . .

68. The Defendant was arrested after Inv. Machetta obtained an arrest warrant for the Defendant's arrest for aggravated assault. While officers were arresting the Defendant for the warrant the Defendant asked why he was being arrested.

69. Officers Diaz, Trevino, and Ledesma and Inv. Machetta were credible witnesses based on the court's observation of them while testifying at the hearing on the Motions coupled with their years of experience in law enforcement.

## C. The Initial Encounter with Haley Under the Bridge

Haley asserts the officers did not have reasonable suspicion to stop and approach him because the description of a "suspicious person" was that of a male wearing a black bandana and carrying a black suitcase. Haley contends that because this description included no indicia of criminal activity and Diaz conceded having a suitcase and wearing a bandana does not indicate criminal activity, Diaz could not reasonably rely on this information to gain reasonable suspicion to stop him. The State asserts the officers' interaction with Haley before he was handcuffed was a consensual encounter that did not require reasonable suspicion.

Alternatively, Haley argues that if the initial encounter was consensual then the encounter escalated into a detention when his freedom to leave and end the interaction was restricted. Haley contends that because Diaz held his identification while he was surrounded by three officers he did not feel free to deny the request to search his suitcase or to leave due to the officers' "show of authority."

### 1. Applicable Law

"There are three distinct types of police-citizen interactions: (1) consensual encounters that do not implicate the Fourth Amendment; (2) investigative detentions that are Fourth Amendment seizures of limited scope and duration that must be supported by a reasonable suspicion of criminal

activity; and (3) arrests, the most intrusive of Fourth Amendment seizures, that are reasonable only if supported by probable cause." *Wade v. State*, 422 S.W.3d 661, 667 (Tex. Crim. App. 2013). "Police officers are as free as any other citizen to approach citizens to ask for information or cooperation." *Id.* "Such consensual encounters may be uncomfortable for a citizen, but they are not Fourth Amendment seizures." *Id.* "And a citizen is free to terminate a consensual encounter at will." *State v. Castleberry*, 332 S.W.3d 460, 466 (Tex. Crim. App. 2011). "An officer may, without reasonable suspicion, request identification and information from a citizen." *Id.* "Even if the officer did not tell the citizen that the request for identification or information may be ignored, the fact that the citizen complied with the request does not negate the consensual nature of the encounter." *Id.*; *see also Monjaras v. State*, 664 S.W.3d 921, 927 (Tex. Crim. App. 2022) ("A consensual encounter will not escalate into an investigative detention solely because an officer asks a citizen for identification and permission to search" or "because an officer fails to inform the citizen that he does not have to comply with the requests"). "However, an investigative detention does occur if the officer conveys to the citizen that compliance with the requests is required." *Monjaras*, 664 S.W.3d at 927.

"No bright-line rule governs when a consensual encounter becomes a detention." *Wade*, 422 S.W.2d at 667. "Courts must take into account the totality of the circumstances of the interaction to decide whether a reasonable person would have felt free to ignore the police officer's request or terminate the consensual encounter." *Id.* "If ignoring the request or terminating the encounter is an option, then no Fourth Amendment seizure has occurred." *Id.* at 668. But "if an officer through force or a show of authority succeeds in restraining a citizen in his liberty, the encounter is no longer consensual; it is a Fourth Amendment detention or arrest, subject to Fourth Amendment scrutiny." *Id.* "The question of whether the particular facts show that a consensual encounter has evolved into a detention is a legal issue that is reviewed de novo." *Id.*

"In determining whether an interaction is a consensual encounter or an investigative detention, the 'time, place, and surrounding circumstances must be taken into account, but the officer's conduct is the most important factor[.]'" *Monjaras*, 664 S.W.3d at 927 (quoting *Castleberry*, 332 S.W.3d at 467). The Court has also used the factors in *United States v. Mendenhall* when assessing "what a reasonable person might have perceived during a given interaction with an officer[.]" *Id.* (citation omitted). "Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

## 2. Analysis

Based on its findings of fact, the trial court made the following relevant conclusions of law:

> 1. Officer Diaz's initial encounter with the Defendant under the bridge was consensual.
> 2. The officers' encounter with the Defendant remained consensual until he was detained in handcuffs after they noticed the Defendant's swollen left hand, found what appeared to be blood on the side of his suitcase and the Nike Monarch shoes, Vaughan's bag, and the bloody t-shirt inside of the suitcase.
> . . .
> 5. The court finds, by clear and convincing evidence, that the Defendant freely and voluntarily consented to the search of his suitcase. The Defendant did not limit the scope of his consent to search his suitcase or ever withdraw his consent.
> 6. Evidence was not illegally seized from the Defendant or his suitcase.

Consistent with the applicable standards of review, we have reviewed the evidence in the light most favorable to the trial court's ruling. Because we will not substitute our judgment for that of the trial court, we defer to its findings and conclude the officer's testimony and the videos admitted at the hearing support the trial court's findings of fact. After a de novo review of the trial court's conclusions of law, we agree the officers' encounter with Haley remained consensual until

he was detained in handcuffs after they noticed his swollen left hand, found what appeared to be blood on the side of his suitcase and the Nike Monarch shoes, and found Vaughan's bag and the bloody t-shirt inside of the suitcase. Accordingly, because the consensual encounter did not implicate the Fourth Amendment we need not consider whether the stop was supported by a reasonable suspicion of criminal activity.

**D.      Did Haley Invoke His Right to Counsel Before He Gave His Statements?**

Haley asserts any statements he made are inadmissible and should have been suppressed because he had invoked his right to counsel. On appeal, Haley contends he requested an attorney while still under the bridge when he asked if he "need[ed] a lawyer or anything" and again while in the interview room when he asked, "where's my lawyer." The State counters that Haley was not in custody for *Miranda* purposes when he made the statements while everyone was under the bridge or shortly after he arrived at the police station. For the reasons explained below, we conclude Haley did not unequivocally invoke his right to counsel until he said, "I want a lawyer" while in the interview room.[3]

**1. Applicable Law**

"[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *see* TEX. CODE CRIM. PROC. art. 38.22 (when statements of an accused may be used). "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. "As for the procedural safeguards to be employed,

---

[3] Therefore, we need not determine whether Haley was in custody for *Miranda* purposes when he made the statements while everyone was under the bridge or shortly after he arrived at the police station

unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required." *Id.* "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* "The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." *Id.* "If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." *Id.* at 444-45. "The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned." *Id.* at 445.

"Invocation of the *Miranda* right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" *Davis v. United States*, 512 U.S. 452, 459 (1994). "But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning." *Id.* "Rather, the suspect must unambiguously request counsel." *Id.* Thus, the accused's mere mention of the word "attorney" or "lawyer" does not automatically invoke the right to have counsel present during questioning; rather, an accused's request for counsel must be unequivocal and unambiguous. *Id.* at 459, 462 (holding suspect's statement "Maybe I should talk to a lawyer" during the interrogation was too equivocal to express a clear desire for the assistance of counsel at that time); *Dinkins v. State*, 894 S.W.2d 330, 351, 352 (Tex. Crim. App. 1995) (holding "Maybe I should talk to someone" failed to specify that the suspect wished to speak with a lawyer and the statement was therefore too ambiguous to constitute

an invocation of counsel); *State v. Gobert*, 275 S.W.3d 888, 892 (Tex. Crim. App. 2009) ("An ambiguous or equivocal statement with respect to counsel does not even require officers to seek clarification, much less halt their interrogation.").

Courts determine whether a suspect's statement referring to a lawyer constitutes an actual invocation of the right to counsel by considering the statement itself and the totality of the circumstances surrounding the statement. *Gobert*, 275 S.W.3d at 892; *Dinkins*, 894 S.W.2d at 351. The inquiry is an objective one: whether the accused articulated his desire for the assistance of counsel sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. *Davis*, 512 U.S. at 458-59; *Gobert*, 275 S.W.3d at 892-93; *Dinkins*, 894 S.W.2d at 351.

**2. Analysis**

Based on its findings recited above, the trial court made the following relevant conclusions of law:

> 7. The Defendant was not in custody for purposes of Miranda or article 38.22 of the Code of Criminal Procedure during the time he interacted with officers or when he made the comments to Inv. Machetta about an attorney under the bridge at the park.
> 8. The Defendant was detained and not in custody for purposes of Miranda or article 38.22 of the Code of Criminal Procedure during the interview with Inv. Machetta at the police station.
> 9. Assuming the defendant was in custody after he was transported to the police station, the Defendant's question "where's my lawyer?" to Inv. Machetta before the interview began was not a clear, unambiguous, and unequivocal invocation of his right to an attorney.
> 10. Assuming the [D]efendant was in custody after he was transported to the police station, the Defendant's question "where's my lawyer?" to Inv. Machetta before the interview began was not in response to, or a product of, an interrogation.
> . . .
> 12. Assuming the Defendant was in custody at the time of the interview at the police station, the Defendant freely and voluntarily waived his statutory and constitutional rights and agreed to speak with Inv. Machetta.
> 13. All of the Defendant's statements to the officers who interacted with him at the park and to Inv. Machetta were freely and voluntarily made in accordance with article 38.21 of the Code of Criminal Procedure.

Consistent with the applicable standards of review, we have reviewed the evidence in the light most favorable to the trial court's ruling. Because we will not substitute our judgment for that of the trial court, we defer to its findings and conclude the officer's testimony and the videos admitted at the hearing support the trial court's findings of fact. After a de novo review of the trial court's conclusions of law, we agree Haley did not unequivocally and unambiguously request a lawyer until he stated, "I want a lawyer" while in the interview room.

## E. Conclusion

Having concluded the record supports the trial court's findings and conclusions, we hold the trial court did not abuse its discretion by denying Haley's motion to suppress.

## EVIDENCE OF MENTAL ILLNESS AND VOLUNTARINESS OF STATEMENTS

Haley asserts his mental illness prevented his statements to the police from being voluntary. On appeal, he asserts the trial court denied him a *Jackson v. Denno* hearing[4] on the admissibility of his statements. The State asserts Haley failed to preserve error on this issue.

In his motions to suppress, Haley did not assert his statements were involuntary due to his mental illness. At the suppression hearing, mental illness was mentioned only once during cross-examination of Officer Trevino:[5]

> Q. Mr. Haley obviously appeared homeless, correct?
> A. Yes, sir.
> Q. You stated that you were looking for a homeless person possibly, right?
> A. Yes, sir.

---

[4] In a *Jackson v. Denno* hearing, the trial court determines the admissibility of a confession based on whether the confession was voluntarily given, but does not consider whether the statement given by appellant was truthful or untruthful. *Martinez v. State*, 127 S.W.3d 792, 797 (Tex. Crim. App. 2004); *see Jackson v. Denno*, 378 U.S. 368, 380 (1964) ("A defendant objecting to the admission of a confession is entitled to a fair hearing in which both the underlying factual issues and the voluntariness of his confession are actually and reliably determined.").

[5] The trial court also paused the hearing on a housekeeping matter related to a motion to evaluate Haley's competency to stand trial. The court noted the motion had been granted and, following an evaluation, a doctor found Haley competent to stand trial; however, an order was never entered. After some discussion with counsel, the trial court accepted the finding. At no point during this discussion did Haley raise the issue of whether his mental illness, if any, prevented his statements from being voluntarily made.

Q. Surely you've encountered homeless people in your line of work before, right?
A. Yes, sir.
Q. And would you agree with me that homeless individuals tend to struggle with mental illness more so than the average person?
Prosecutor: Judge, I would object as to relevance. This –
Court: Let's keep going.
Defense counsel: May I respond, Your Honor?
Court: Let's just keep going.

A motion to suppress is a specialized objection to the admissibility of evidence and must be timely and sufficiently specific to inform the trial court of the complaint. *Johnson v. State*, 171 S.W.3d 643, 647 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd). A party who (1) files a pretrial motion to suppress evidence that presents arguments global in nature and contains little more than citations to constitutional and statutory provisions, and (2) fails to argue specific grounds for suppressing evidence at the suppression hearing, waives error. *See Swain v. State*, 181 S.W.3d 359, 365 (Tex. Crim. App. 2005) ("Appellant's global statements in his pretrial motion to suppress were not sufficiently specific to preserve the arguments he now makes on appeal."); *Mbugua v. State*, 312 S.W.3d 657, 666-67 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) (general statements in a suppression motion did not alert the trial court that the defendant wished a specific complaint to be decided); TEX. R. APP. P. 33.1.

Haley's pretrial motions to suppress presented arguments that were global in nature and contained nothing more than citations to constitutional and statutory authority. During the suppression hearing, Haley did not contend his mental health affected the voluntariness of his statements, nor was the issue raised during closing arguments. Because Haley's complaint on appeal does not comport with the grounds for suppression raised in the trial court, he has failed to preserve any error. *See Swain*, 181 S.W.3d at 367; *Saunders v. State*, No. 04-17-00385-CR, 2018 WL 3039924, at *2 (Tex. App.—San Antonio June 20, 2018, no pet.) (mem. op., not designated for publication) (concluding Saunders waived issue on appeal because the record did not show he

raised the issue that Texas Transportation Code section 547.606(a) did not apply to his truck with sufficient specificity to make the trial court aware of the basis of his complaint).

### ASSESSMENT OF ATTORNEY'S FEES IN THE JUDGMENT

In its judgment, the trial court assessed $15,000 in attorney's fees against Haley. On appeal, both Haley and the State contend this was in error because Haley is indigent. We agree.

"A defendant who is determined by the court to be indigent is presumed to remain indigent for the remainder of the proceedings in the case unless a material change in the defendant's financial circumstances occurs." TEX. CODE CRIM. PROC. art. 26.04(p). Haley was appointed legal counsel by the trial court; at trial, he was represented by the Hill Country Regional Public Defender Office; this representation has continued through his appeal; and his financial status did not change. Therefore, the trial court erred by requiring Haley to pay attorney's fees. Accordingly, we modify the portion of the trial court's judgment by deleting the attorney's fees in the amount of $15,000. *See Fulmer v. State*, 401 S.W.3d 305, 319 (Tex. App.—San Antonio 2013, pet. ref'd) ("Because we must presume Fulmer remained indigent and the State produced no evidence or argument indicating that the trial court determined Fulmer had the financial resources to enable him to pay attorney's fees, the trial court's judgment requiring him to do so was erroneous.").

### CONCLUSION

We modify the judgment to delete the requirement that Haley pay $15,000 in attorney's fees and affirm the judgment as modified.

Lori I. Valenzuela, Justice

Do not publish